Joseph **HEDGLIN**, et al., Respondents,

v.

**CITY OF WILLMAR**, et al.,
petitioners, Appellants.

No. C1–97–520.

Supreme Court of Minnesota.

Aug. 13, 1998.

---

Jon K. Iverson, James R. Andreen, Erstad & Riemer, P.A., Minneapolis, for Appellants.

Steven C. Wang, Schneider Law Firm, Willmar, for Respondents.

## OPINION

PAUL H. ANDERSON, Justice.

In June 1995, respondents, former Willmar, Minnesota firefighters Joseph Hedglin, Bradley Lundquist, and Robert Grove commenced an action against appellants, former Willmar Fire Chief Douglas Lindblad and the City of Willmar, under the whistleblower statute, Minn.Stat. § 181.932 (1996). The complaint alleged that Lindblad and the city had violated the statute by retaliating against Hedglin, Lundquist, and Grove after they had reported misconduct at the fire department to city officials. The Kandiyohi County District Court granted summary judgment to Lindblad and the city, concluding that the statute did not protect the reports. The court of appeals reversed, and Lindblad and the city petitioned for review. We conclude that most, but not all, of the firefighters' reports of misconduct are protected by the statute. We therefore affirm in part and reverse in part.

Many of the facts in this case are still disputed, including what reports were made, when they were made, and whether any harassment or retaliation took place. Because the case comes before us on summary judgment in favor of Lindblad and the city, we view the disputed facts in the light most favorable to Hedglin, Lundquist, and Grove. See Vetter v. Security Continental Ins. Co., 567 N.W.2d 516, 520 (Minn.1997).

### A. Fire Department Command Structure

Before 1994, the fire chief and all other officers in the Willmar Fire Department were elected by the members of the fire department. Lundquist served as first assistant chief under Chief Lindblad from 1980 until 1985, when Lindblad resigned. In 1986, Lundquist was elected as chief. Later that year, Lindblad returned to the fire department as a firefighter. Lundquist served as chief from 1986 to 1991 with Grove as his first assistant chief for part of that time. During Lundquist's tenure as chief, he disciplined both Lindblad and firefighter Michael Schroeder on a number of occasions for various types of misconduct, including Lindblad's unauthorized use of fire department equipment and facilities and Schroeder's inappropriate sexual advances toward another firefighter, which had led to a fight with the other firefighter's husband. Lindblad and Schroeder disagreed with most of the disciplinary actions Lundquist took against them.

In 1990, Lindblad ran for chief, but was defeated by Lundquist. At the end of 1991, elections were held again. Under the normal procedure, candidates for officer positions placed their names on a board in the fire station before the election. In 1991, only Lundquist had posted his name as a candidate for chief. Nevertheless, Schroeder campaigned among the other firefighters for Lindblad as chief. The night of the election, as was allowed, a nomination was made from the floor for Lindblad as chief. A vote was taken, and Lindblad defeated Lundquist, 23 to 19. After Lindblad won the election, a number of the posted candidates for other officer positions, including Grove, withdrew their names as nominees for office. Schroeder was then elected as first assistant chief to serve under Lindblad.

When the newly-elected officers took their positions in the beginning of 1992, it was clear that two distinct factions existed within the fire department—either pro-Lindblad or pro-Lundquist. Several firefighters from the pro-Lundquist faction, including Hedglin, Lundquist, and Grove, claim that they observed and reported misconduct in the fire department and as a consequence began to

be harassed by other members of the department.

Eventually, the Willmar City Council decided to change the officer selection process. Rather than having the fire department hold an annual election, the council decided to appoint a fire chief. In 1994, the council appointed Lindblad to continue to serve as chief, a position he held until he retired in July 1995.

### B. Retaliation against Grove

In March 1992, Grove reported to a city official that the current officers were unqualified. He also reported that some officers were coming to fire calls after they had been drinking and that firefighters were driving fire trucks to fire calls while they were drunk. Grove asserts that his reports resulted in the following harassment: Lindblad told the firefighters at a department meeting not to talk to the members of the pro-Lundquist faction, firefighters drove by Grove's house honking their horns, Grove was given the silent treatment, and one of the pro-Lindblad firefighters would not let Grove on the fire truck when responding to a fire call. On another occasion, one of the lieutenants at the fire station pushed Grove, swore at him, and told him to get out of the station.

In addition, Grove claims that once when he went inside a house at a fire call to cut the electrical wires on a ceiling fan, the actions of other firefighters put him in danger. Grove first made sure that the electricity was off and then he proceeded to cut the wires and remove the fan. While Grove was doing this, other firefighters turned the electricity back on. Grove radioed to Lindblad, notifying him that he was still in the house, but Lindblad told Grove not to worry because they had enough other people there to carry his body out.

Other firefighters allegedly tampered with Grove's fire gear and clothing. For example, one time his fire boots were wet and smelled like urine. He also complains that no one from the fire department sent him a get-well card when he was sick, and that when he retired he did not receive a plaque or a retirement party as other firefighters traditionally did.

### C. Retaliation Against Lundquist

In May 1992, Lundquist reported to the city administrator that Schroeder, the first assistant chief, falsified roll call sheets to state that Schroeder was present when he was not, so that he was paid for fire calls that he did not attend. Lundquist also reported to Lindblad and to the city's community development director that officers came drunk to fire calls. After Lundquist made these reports, he states that he was "basically an outcast" at the fire department. He was shunned by other firefighters, he was not always given credit for his fire calls, at times his gear was missing or turned inside out, the mail he received at the fire department was opened, and several times Lindblad berated him in front of the other firefighters. At one point, a fire captain swore at Lundquist and told him to get out of the fire station. Also, Lundquist heard that someone at the fire station told Schroeder that Lundquist might be transferred, and Schroeder got down on his knees and said, "Praise Allah." Like Grove, Lundquist did not receive a plaque or a party when he retired.

There also are allegations, however, that Lundquist harassed firefighters in the pro-Lindblad faction. For example, Schroeder claims that Lundquist called him and members of the pro-Lindblad faction obscene names and that Lundquist made an obscene gesture at him. Lindblad reports, and Lundquist admits, that Lundquist made an obscene gesture when Lindblad was trying to discipline Lundquist for other alleged misconduct. Schroeder also stated that Lundquist was a safety hazard because he refused to follow his supervisors' directions at fire calls.

### D. Attendance at Fire Calls

At the beginning of 1993, the fire department conducted its annual review of fire call attendance, which revealed that a number of the firefighters, including Hedglin, Lundquist, and Grove, were not attending at least 70% of fire calls as fire department policy required. The review board held a meeting that each of the delinquent firefighters was required to attend. At the meeting, it was determined that Hedglin had in fact attended

the requisite number of fire calls. He was not disciplined and does not claim that his required attendance before the review board was harassment.

The records purportedly showed that Lundquist had attended only 46.9% of the fire calls and Grove had attended only 48.3% of the fire calls in the previous year. The review board recommended that Lundquist and Grove be discharged from the fire department. Lindblad agreed with the board recommendation and discharged both Lundquist and Grove. But the city administrator reinstated Lundquist and Grove, concluding that Lindblad did not have the authority as fire chief to discharge the firefighters. Both Lundquist and Grove, however, were put on probation for their low attendance at fire calls and their attitudes toward the job. Both consider this discipline to be part of the harassing conduct against them.

### Retaliation Against Hedglin

In May 1993, Hedglin confronted Schroeder and accused him of altering roll call sheets so that Schroeder was paid for fire calls he did not attend. In response, Schroeder asked Hedglin to come to the fire station that evening for a meeting with Lindblad regarding this accusation. Hedglin agreed, but called certain city council members to come to the meeting as well. Before the meeting, Hedglin passed Lindblad in the hall, and Lindblad told Hedglin that he was acting like a puppet. The meeting was held, but nothing was resolved. Lindblad told Hedglin that in the future all communications between them should be in writing. The next day, Hedglin reported these events to the county attorney, the city attorney, and the city administrator. After Hedglin reported Schroeder's roll call violations, the harassment against him began. More particularly, Lindblad refused to speak to him and moved him to another company within the fire department. When Lindblad talked about Hedglin, he referred to him using an obscene term, and other firefighters also refused to talk to Hedglin.

### F. Resignations from the Fire Department

In February 1994, both Lundquist and Grove resigned from the fire department. Both stated initially that they were resigning for medical reasons in order to receive retirement benefits under their pension plan. Lundquist submitted a letter from his doctor stating that due to a shoulder injury "it is impossible for [him] to perform the duties of a fireman." Grove stated that he could no longer stay with the fire department because he had Ménière's disease, a disease of the middle ear that affects balance. Both Lundquist and Grove now claim, however, that they are physically able to do the job of a firefighter, but resigned only because of the harassment.

Hedglin resigned in 1995, telling the fire department that he was quitting because of his hearing loss. Hedglin provided the department with a letter from his doctor, stating that he would have "progressive hearing loss if he * * * continues to be exposed to high decibel levels during the course of his fire fighting." Like Lundquist and Grove, Hedglin now claims that he would not have resigned absent the harassment.

### G. The Cause of Action

In July 1995, Hedglin, Lundquist, and Grove commenced an action against Lindblad and the city, claiming that they were entitled to the protection of the whistleblower statute because they had been harassed and discriminated against as a result of their good faith reports of state law violations. Lindblad and the city brought a motion for summary judgment, arguing that the three firefighters could not maintain a claim under the statute.

The district court granted the motion for summary judgment, concluding that the alleged harassment predated the reports of intoxication. Further, the court concluded that falsifying roll call sheets was an internal management issue that did not implicate the public interest or safety and thus reports about that issue were not protected by the whistleblower statute.

The court of appeals reversed, concluding that a jury could reasonably find that the harassment continued as a result of the reports of intoxication. Moreover, the court of appeals held that the falsification of roll call sheets in this context constitutes the illegal taking of public funds, reports of which are protected conduct under the whistleblower

statute. Therefore, the court of appeals reversed the grant of summary judgment. Lindblad and the city petitioned for review solely on the issue of whether the reports made are protected by the statute.

## I.

■ On appeal from a grant of summary judgment, we review the record to determine whether there are any genuine issues of material fact and whether the lower court erred in its application of the law. *Vetter,* 567 N.W.2d at 520. Viewing the evidence in the light most favorable to the party against whom summary judgment was granted— here, Hedglin, Lundquist, and Grove—we evaluate whether their reports constitute protected conduct under the whistleblower statute. *See id.*

It is unfortunate that the members of Willmar's fire department allowed this situation to escalate to the point where it likely reduced the effectiveness of fire protection in the Willmar area and is now consuming judicial resources in order to be resolved. Nevertheless, we must proceed to decide the issue it raises, and because this is an issue of first impression, some background information on at-will employment proves helpful. Traditionally, all employment was at will, meaning that an employer could fire an employee for any reason or for no reason at all. 82 Am.Jur.2d *Wrongful Discharge* § 1 (1992). Slowly, courts began to create exceptions to the general rule of at-will employment that allowed employees to recover for the tort of wrongful discharge. *Id.* § 8. One judicially-created and narrowly-construed exception was the public policy exception that allowed an employee to maintain a cause of action for wrongful discharge only if the protected conduct violated clearly mandated public policy. *Id.* §§ 11–12. For example, if an employee refused to obey an employer's command to violate a criminal law, that employee could recover for wrongful discharge if the employer tried to fire the employee in retaliation, because refusing to violate a criminal law promotes a clearly mandated public policy for which the employee should not suffer harm. *Id.* § 14. On the other hand, violations of internal company policy or improprieties in private companies normally do not implicate public policy, but affect only the company; thus, reports of only internal policy violations or improprieties may not be protected by the public policy exception. *Id.* § 61.

In Minnesota, our court of appeals approved the public policy exception to at-will employment in *Phipps v. Clark Oil & Refining Corp.,* 396 N.W.2d 588, 592 (Minn.App. 1986), *aff'd,* 408 N.W.2d 569 (Minn.1987). We granted the petition for review of *Phipps,* but before we issued an opinion, the Minnesota legislature enacted the whistleblower statute. *See Phipps,* 408 N.W.2d at 571. Thus, we did not resolve in *Phipps* "the policy question of whether or not Minnesota should join the three-fifths of the states that now recognize, to some extent, a cause of action for wrongful discharge." *Id.*

Enacted in 1987, the whistleblower statute prohibits employers from retaliating against employees for certain protected activity, including reporting violations of the law:

> Subdivision 1. Prohibited action. An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (a) the employee * * * in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

Minn.Stat. § 181.932, subd. 1(a).

■ The construction of a statute is a question of law which we review de novo. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn. 1985). When we interpret statutes, we must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (1996). If the words of the statute are free from ambiguity, we will not disregard them. *Id.* Therefore, any statutory construction must begin with the language of the statute. The whistleblower statute protects reports made in good faith of "a violation or suspected violation of *any* federal or state law or rule adopted pursuant to law." Minn.Stat. § 181.932, subd. 1(a) (emphasis added). We

conclude that this language clearly and unambiguously protects reports made of a violation of any federal or state law or rule adopted pursuant to law.

Hedglin, Lundquist, and Grove allege that their reports involved violations of state law. Having concluded that the whistleblower statute protects reports made of violations of any state law, we must determine whether the reports made by the three firefighters constitute reports of state law violations. The reports fall into three categories: (1) Hedglin and Lundquist reported that Schroeder falsified roll call sheets and therefore was paid for fire calls that he did not attend; (2) Grove reported that firefighters were driving fire trucks to fire calls while drunk; and (3) Lundquist and Grove reported that fire department officers attended fire calls while drunk.

■ Lindblad and the city argue that falsifying roll call sheets does not implicate any state statute. Hedglin and Lundquist, however, point to a number of statutes that are implicated. Under Minn.Stat. § 609.455 (1996), a public employee who allows a demand which the employee knows to be false to be made on a government entity may be criminally sanctioned. In addition, Minn. Stat. § 609.465 (1996) provides that anyone who presents a claim for payment to a public body, knowing the claim to be false and having the intent to defraud, is guilty of attempt to commit theft of public funds. Hedglin and Lundquist also point to Minn. Stat. § 609.65 (1996), which applies primarily to notary publics, but also to public officers who falsely certify that an act was performed. Under this statute, the public officer is guilty even if there was no intent to injure or defraud. Minn.Stat. § 609.65(2). A violation of any of these statutes carries a penalty of imprisonment and a fine.

The reports of firefighters driving fire trucks while drunk clearly implicate Minn. Stat. § 169.121 (1996), which prohibits any person from driving a motor vehicle while under the influence of alcohol. A violation of this statute also carries a penalty of imprisonment and a fine.

There may be fact questions as to whether any of these statutes were actually violated, but for purposes of the whistleblower statute, it is irrelevant whether there were any actual violations; the only requirement is that the reports of state law violations were made in good faith. *See* Minn.Stat. § 181.932, subd. 1(a). Because Hedglin's and Lundquist's reports of roll call sheet falsification and Grove's report of firefighters driving fire trucks while drunk implicate possible state law violations, we conclude that these reports are protected by the statute if they were made in good faith.

■ We conclude, however, that the vague reports made by Lundquist and Grove that some of the fire officers were showing up at fire calls while drunk are not protected by the whistleblower statute. While we find such conduct reprehensible, if in fact it did occur, we can find no statute or rule that is violated by such conduct, nor could Lundquist and Grove's counsel point to any such statute or rule.

### II.

Although some of the firefighters' reports of misconduct constitute protected conduct under the clear and unambiguous language of the whistleblower statute, Lindblad and the city urge us to read into the statute an additional requirement from the common law public policy exception to at-will employment. Lindblad and the city argue that the common law requirement that a clearly mandated public policy be implicated in an employee's report of wrongdoing still exists and is applicable to the statute. As support, they cite to *Vonch v. Carlson Cos.*, 439 N.W.2d 406 (Minn.App.), *pet. for rev. denied* (Minn., July 12, 1989), and *Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483 (Minn.1996). Lindblad and the city thus contend that the reports made by Hedglin, Lundquist, and Grove are not protected by the statute because the reports did not implicate clearly mandated public policy.

We explicitly reject Lindblad and the city's reliance on *Vonch* and *Williams* to argue that we should read any additional requirement into the whistleblower statute. In *Vonch,* the court of appeals affirmed the grant of summary judgment for an employer in a wrongful discharge case when a private employee was discharged for reporting inter-

nal travel and expense improprieties to the employer, because the court concluded that these were only internal improprieties that only marginally affected the public interest. *Id.* at 408. Although the court of appeals cited to the whistleblower statute, the statute was not in effect at the time the employee reported the misconduct or when he was discharged. *Id.* at 407. In its conclusion, the court of appeals stated that the public policy exception was only intended to protect the general public and not specific employees. *Id.* at 408. Therefore, any statements made by the *Vonch* court do not apply to claims brought specifically under the statute.

Although *Williams* did address a claim brought under the whistleblower statute, our only holding in *Williams* was that a plaintiff who brings a claim under the Human Rights Act is barred from also bringing a claim under the whistleblower statute. 551 N.W.2d at 486. There, the plaintiff's reports involved only misconduct committed against her. *Id.* at 484. In dictum, we cited to several court of appeals cases, including *Vonch,* and stated that we could have ruled alternatively that the plaintiff in *Williams* had not stated a cause of action under the whistleblower statute:

> The popular title of the [whistleblower statute] connotes an action by a neutral— one who is not personally and uniquely affronted by the employer's unlawful conduct but rather one who "blows the whistle" for the protection of the general public or, at the least, some third person or persons in addition to the whistleblower. Were it otherwise, every allegedly wrongful termination of employment could, with a bit of ingenuity, be cast as a claim pursuant to [the statute].

*Id.* at 484 n. 1. This dictum does caution against construing the statute too broadly, and we agree with this cautionary language. But applying this language from *Williams* to the case at hand does not eliminate Hedglin's, Lundquist's, and Grove's causes of action because most of the reports they made were not for their personal protection, but for the protection of the general public.

Finally, we conclude that we need not decide whether the public policy requirement applies to the whistleblower statute because here the misconduct reported did implicate clearly mandated public policy. Grove reported that firefighters were driving fire trucks while drunk. The firefighters were allegedly driving city vehicles on city streets while under the influence of alcohol and could have caused substantial damage to other drivers, pedestrians, or property. This conduct certainly implicates public policy. Hedglin and Lundquist reported that the city paid Schroeder for fire calls that he did not attend because someone falsified the roll call sheets. Courts from other jurisdictions have concluded that public policy is implicated when the reported violation implicates the government or public funds. *See, e.g., Smith v. Mitre Corp.,* 949 F.Supp. 943, 951–52 (D.Mass.1997) (holding that an employee had a common law cause of action for wrongful discharge for reporting possible fraud in the receipt of government funds "even when that whistleblowing is confined within the company"). We agree with this conclusion. Therefore, even if we were to reach the issue of whether the narrow common law requirements should apply to a claim brought under the statute, the reports of the falsification of roll call sheets and drunk driving would be protected conduct.

In conclusion, we hold that the whistleblower statute, by its plain language, protects reports made of a violation of any state or federal law or rule adopted pursuant to law. The reports of the falsification of roll call sheets and drunk driving implicate state law violations and clearly mandated public policy, and, therefore, fall within the protection of the statute. Having made this determination, we need not decide whether the common law public policy requirement applies to the statute. Based on our conclusion, the respondents can proceed with their cause of action.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.