Kimberly DONAHUE, Appellant,

v.

SCHWEGMAN, LUNDBERG,
WOESSNER & KLUTH,
P.A., Respondent.

No. C7–98–1018.

Court of Appeals of Minnesota.

Dec. 15, 1998.

Donald H. Nichols, Steven Andrew Smith, Nichols Kaster & Anderson, Minneapolis, MN (for appellant).

Terrence J. Fleming, Ann E. Kennedy, Lindquist & Vennum, P.L.L.P., Minneapolis, MN (for respondent).

Considered and decided by DAVIES, Presiding Judge, SCHUMACHER, Judge, and SHORT, Judge.

## O P I N I O N

SHORT, Judge.

Kimberly Donahue sued her former employer, the law firm of Schwegman, Lundberg, Woessner & Kluth, P.A. (law firm), alleging constructive discharge in violation of the Whistleblower Act, Minn.Stat. § 181.932, subd. 1(a) (1996), and the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1(2)(b)-(c) (Supp.1997). The trial court concluded there was no public interest in the law firm's billing and payroll deduction practices, and Donahue failed to offer specific facts supporting her claims. On appeal from summary dismissal of her claims, Donahue argues the trial court misapplied the law.

## F A C T S

In December 1993, Kimberly Donahue was hired as a law clerk for the law firm. Two years later Donahue became a full-time associate with a starting salary of $85,000 per year. On January 24, 1997, a law firm employee told Donahue that the law firm attached a 10% surcharge to the cost of all long distance calls made from the law firm and automatically deducted the surcharge from employee paychecks. Donahue sent an e-mail to three of the law firm's shareholders demanding that they disclose this billing and payroll deduction practice to all employees. Steve Lundberg, a managing shareholder, informed Donahue that the surcharge covered administrative costs associated with providing long distance phone service. However, Donahue was still concerned about the surcharge and payroll deduction practice, and reported to another shareholder that the practice may be unethical and violated Minnesota law. When Lundberg learned of

Donahue's suggestion that the law firm was breaking the law, he sent Donahue an e-mail authorizing her to hire independent counsel to obtain a written opinion about the billing and payroll deduction practice. Lundberg also notified all law firm employees of the surcharge.

On February 4, 1997, the law firm stopped adding the 10% surcharge to long distance telephone costs. One week later, the attorney retained by Donahue to research the law firm's billing and payroll deduction practice submitted an evaluation that concluded the practice, due to its collection method of automatic deduction as opposed to the surcharge itself, was potentially illegal and unethical. In response, the law firm implemented a new system that permitted employees to pay monthly, either by check or deduction, for their telephone expenses.

Following this exchange concerning the payroll deduction practice, the law firm issued its February billing report, which, like previous billing reports, listed Donahue's year-to-date billing below her required hours. On March 17, 1997, the law firm placed Donahue on an alternative compensation plan, which did not implicate her status on the shareholder track, but reduced her minimum billing goal and withheld 33% of her salary unless she achieved her original, year-end billable hours goal. Around the same time, Donahue began looking for other employment. After considering two other comparable positions, Donahue resigned on April 22, 1997, to work for Faegre & Benson, L.L.P.

## ISSUES

I. Is there a public policy requirement under Minnesota's whistleblower statute?

II. Did Donahue fail to establish a claim of constructive discharge due to gender discrimination?

## ANALYSIS

█ Statutory construction presents a question of law, which we review de novo. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn. 1985). On appeal from summary judgment, we determine whether genuine issues of material fact exist or whether the trial court erred in its application of the law. Minn. R. Civ. P. 56.03; *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997). While we view the evidence in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to create an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Ruud v. Great Plains Supply, Inc.,* 526 N.W.2d 369, 371 (Minn.1995). Allegations and speculation are not enough to avoid summary judgment. *Bob Useldinger & Sons, Inc. v. Hangsleben,* 505 N.W.2d 323, 328 (Minn.1993).

## I.

Minnesota's whistleblower statute states, in relevant part:

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(a) the employee * * * in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

* * *

(c) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason.

Minn.Stat. § 181.932, subd. 1(a), (c) (Supp. 1997).

█ Donahue argues her report of the law firm's surcharge on long distance telephone calls and related payroll deduction practice led to her constructive discharge. However, the mere mention of a suspected violation already acknowledged by one's employer does not constitute a "report" under the whistleblower statute. *Rothmeier v. Investment Advisers, Inc.,* 556 N.W.2d 590, 593

(Minn.App.1996), *review denied* (Minn. Feb. 26, 1997); *see also Faust v. Ryder Commercial Leasing & Servs.*, 954 S.W.2d 383, 391 (Mo.Ct.App.1997) (concluding employee's "courtesy warning" to managers of possible exposure of their criminal activity does not constitute "whistleblowing"); *Michaelson v. Minnesota Mining & Mfg. Co.*, 474 N.W.2d 174, 180 (Minn.App.1991) (characterizing employee's "report" as feedback which was insufficient to establish retaliatory discharge claim), *aff'd*, 479 N.W.2d 58 (Minn.1992). Donahue reported the law firm's billing and payroll deduction practice via an e-mail message to Lundberg on January 24, 1997. At that time, Donahue noted "I have now found out that other employees have discovered this, and brought it to your attention some time ago, yet the practice continues." Given this undisputed fact, we conclude her initial report amounted to nothing more than a complaint regarding an acknowledged law firm practice, and thus is not protected under the whistleblower statute.

■ Donahue also argues her second "report" on around February 3, 1997, to another law firm shareholder is protected under the whistleblower statute because, even if the law firm was aware of the payroll deduction practice, Donahue did not believe the law firm knew of its potential illegality. While this may be true when the facts are analyzed in the light most favorable to Donahue, her "report" concerning an internal payroll deduction practice fails to implicate public policy. *See Hedglin v. City of Willmar*, 582 N.W.2d 897, 903 (Minn.1998) (recognizing firefighters' reports also implicated public interest, and cautioning against construing whistleblower statute too broadly to protect reports without public policy nexus); *see also Janklow v. Minnesota Bd. of Exam'rs for Nursing Home Adm'rs*, 552 N.W.2d 711, 717 (Minn.1996) (stating "Whistleblower Act was enacted to protect the general public"); *Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 484 n. 1 (Minn.1996) (noting title of "whistleblower act" connotes action by neutral, or one who "blows the whistle" for protection of others in addition to whistleblower); *Bersch v. Rgnonti & Assocs., Inc.*, 584 N.W.2d 783, 787 (Minn.App.1998) (concluding Minn.Stat. § 181.932, subd. 1(b) does not include additional public policy requirement because it already pertains to public initiated activities, but acknowledging Minnesota Supreme Court's caution in construing whistleblower statute too broadly), *pet. for review filed* (Minn. Nov. 12, 1998). *See generally* James H. Kaster, *Putting "Public Policy" Back into Minnesota's Whistleblower Statute*, Hennepin Law., June 1998, at 4–6 (discussing Minnesota's dilemma in interpreting scope of whistleblower statute).

■ Because interpreting the whistleblower statute to include a public policy requirement supports Minnesota's careful limitation of at-will employment exceptions to further public interest, we also conclude Donahue's failure to report a practice that implicates public policy leaves her unprotected by the whistleblower statute. *See Phipps v. Clark Oil & Refining Corp.*, 396 N.W.2d 588, 590–91 (Minn.App.1986) (recognizing tort of wrongful discharge that requires termination contravene "clear mandate of public policy"), *aff'd*, 408 N.W.2d 569, 571 (Minn.1987); *see also* Jonathan W.J. Armour, *Who's Afraid of the Big, Bad Whistle?: Minnesota's Recent Trend Toward Limiting Employer Liability Under the Whistleblower Statute*, 19 Hamline L.Rev. 107, 114–16 (1995) (discussing evolution of public policy exception to employment at-will in Minnesota and other states).

■ Donahue argues she based her report to law firm shareholders on a good faith belief that the law firm's payroll deduction practice violated Minn.Stat. § 181.79 and, because all statutes are designed to protect the public, her report involved the public interest. *See* Minn.Stat. § 181.79, subd. 1 (1996) (prohibiting employers from making unauthorized deductions from employee paychecks). However, although the legislature intended the whistleblower statute to bring sweeping protection to employees who report wrongdoing by employers, we do not believe the intent was to obliterate employment at-will. Instead, both the common-law public policy exception and the whistleblower statute only protect employees who expose violations of law designed to promote the public's morals, health, safety and welfare. *See Hedglin*, 582 N.W.2d at 903 (concluding re-

port of falsification of fire department's roll calls and drunk driving of trucks to fire calls implicates public policy); *Vonch v. Carlson Cos.,* 439 N.W.2d 406, 408 (Minn.App.1989) (finding report of company theft and fraud not in furtherance of public interest), *review denied,* (Minn. July 12, 1989); *see also Black's Law Dictionary* 1231 (6th ed.1990) (defining "public policy" as "community common sense and common conscience, extended and applied throughout the state to matters of public morals, health, safety, welfare, and the like").

This interpretation of the whistleblower statute is supported by decisions from foreign jurisdictions. *See Littman v. Firestone Tire & Rubber Co.,* 715 F.Supp. 90, 93 (S.D.N.Y.1989) (applying New Jersey law and holding report of fraud directed only at company's shareholders not protected under Conscientious Employee Protection Act); *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 380 (Cal.1988) (characterizing report of employer's former conviction of embezzlement as relevant business information not protected by public policy); *Leibowitz v. Bank Leumi Trust Co.,* 152 A.D.2d 169, 548 N.Y.S.2d 513, 518 (N.Y.App.Div.1989) (denying whistleblower claim by employee who was forced to quit for reporting fraudulent activities of car dealership because they were not danger to public health or safety). *But see Sullivan v. Massachusetts Mut. Life Ins. Co.,* 802 F.Supp. 716, 723 (D.Conn.1992) (concluding report of insider trading protected under claim of wrongful discharge); *Castaneda v. Texas Dep't of Agric.,* 831 S.W.2d 501, 505 (Tex.App.1992) (reversing summary judgment because employee's report of internal business problems, based on rumor and innuendo, was within purview of whistleblower statute).

Although Donahue's report involved more than a personal interest, alleged unauthorized deductions from employees' paychecks have an internal impact only and do not affect morals, health, safety, and welfare of the public. Under these circumstances, the law firm's payroll deduction practices did not raise public interest concerns. *See, e.g., Nichols v. Metropolitan Center for Indepen-*

*dent Living, Inc.,* 50 F.3d 514, 517 (8th Cir. 1995) (affirming summary judgment against employee where report of changes which caused employer to jeopardize eligibility for public funding did not implicate law enacted for benefit of general public, but related to internal management problem); *Morrow v. Air Methods, Inc.,* 884 F.Supp. 1353, 1358 (D.Minn.1995) (holding report of violations of company policy related to internal management issues does not implicate public policy, and is not actionable under Minnesota's whistleblower statute); *Thompson v. Campbell,* 845 F.Supp. 665, 675 n. 9 (D.Minn.1994) (noting complaints centered around internal management problems not covered by whistleblower statute).

## II.

The Minnesota Human Rights Act provides, in pertinent part:

> Except when based on bona fide occupational qualification, it is an unfair employment practice:
>
> * * * *
>
> (2) for an employer, because of race, color, creed, religion, national origin, sex, marital status * * *
>
> (b) to discharge an employee; or
>
> (c) to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

Minn.Stat. § 363.03, subd. 1(2)(b)-(c) (1996). To establish a prima facie case of gender discrimination, an employee must show: (a) protected class membership; (b) qualifications; and (c) an adverse employment action from which similarly situated males were exempt. *Sigurdson v. Isanti Co.,* 386 N.W.2d 715, 720 (Minn.1986). Moreover, to establish a prima facie case of constructive discharge as a result of gender discrimination, an employee must prove intolerable working conditions created by the employer with the intention of forcing the employee to resign. *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981); *Pribil v. Archdiocese of St. Paul & Minneapolis,* 533 N.W.2d 410, 412 (Minn.App.1995); *see Bart-*

*man v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986) (concluding employee's resignation was caused by natural expiration of benefits, not intolerable working conditions created by employer, and thus employee failed to assert valid claim of constructive discharge).

■ It is undisputed Donahue is a member of a protected class and a qualified employee. We are asked, therefore, whether she has produced evidence of an adverse employment action from which similarly situated males were exempt and which caused intolerable work conditions. Donahue does not allege she received unequal pay or was denied benefits, bonuses, training or promotions. Instead, she alleges the law firm: (1) cut time earned by female attorneys at a higher rate than similarly situated male attorneys; (2) excluded female attorneys from law firm decisions; (3) only placed female attorneys on alternative compensation plans; (4) subjected her to sexual advances outside the office by a firm colleague; and (5) temporarily placed female attorneys in cramped office space with inadequate support staff. However, those allegations are without factual support and are contrary to direct evidence.

First, Donahue's 1995 complaint regarding time-cutting relates to differences in realization rates among practice groups. Those practice groups, i.e., chemical, electrical/computer, and mechanical, included both male and female attorneys. In relevant billing years, the realization rates of female attorneys in the chemical group, including Donahue, were on par with the realization rates of other law firm attorneys.

Second, Donahue was a member of the law firm's management team and the head of recruitment for the law firm. In that capacity, she agrees she participated in law firm decisions. Third, male attorneys also were placed on alternative compensation plans, which permitted full pay if billable hour goals were met. Fourth, since 1994, when she told her colleague she wanted their relationship to remain professional, Donahue agrees he has complied fully with her request.

■ And fifth, when the law firm outgrew its space, some attorneys volunteered to share temporary conference rooms if the law firm installed personal computers in their homes so they could also work outside of the office. In addition, both male and female attorneys were impacted when the chemical group was the first to relocate. After the law firm moved to its new offices, however, all attorneys were assigned external offices. Given this evidence, Donahue's allegations do not create a fact issue as to whether she was subjected to adverse employment actions from which similarly situated male attorneys were exempt. *See French v. Eagle Nursing Home, Inc.*, 973 F.Supp. 870, 877–78 (D.Minn.1997) (affirming summary judgment in favor of employer on discrimination claim because facts did not substantiate employee's claim men were paid more than women, had better working conditions than women, and disciplined less than women); *see, e.g., White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir.1990) (granting summary judgment to employer in Title VII case where employee failed to point to evidence that showed genuine issues for trial); *Braziel v. Loram Maintenance of Way, Inc.*, 943 F.Supp. 1083, 1093 (D.Minn. 1996) (stating nonmoving party may not rest on undeveloped or insufficient facts to defeat motion for summary judgment); *Kennedy v. GN Danavox*, 928 F.Supp. 866, 870 (D.Minn. 1996) (noting summary judgment appropriate where plaintiff fails to support essential elements of claim). Furthermore, the work conditions as alleged are not so "intolerable" as to establish a claim of constructive discharge as a matter of law. *See Continental Can Co. v. State*, 297 N.W.2d 241, 249 (Minn. 1980) (noting under sex discrimination claim MHRA does not impose duty on employer to maintain pristine working environment); *see also Thompson*, 845 F.Supp. at 673–74 (holding work environment not intolerable even though men talked about female anatomy at work and made sexual advances toward female employees). The trial court properly granted summary judgment in favor of the law firm on Donahue's gender discrimination claim.

# DECISION

Donahue's report about the law firm's payroll deduction practices does not impact the

public's morals, health, safety, and welfare. In addition, Donahue failed to establish a prima facie case of constructive discharge due to gender discrimination.

Under these circumstances, the trial court properly entered judgment in favor of the law firm.

**Affirmed.**

DAVIES, Judge (dissenting).

I respectfully dissent.

I probably have little objection to the legal analysis of the majority. But my reading of the record is so different from that of the majority that I cannot tell for sure.

In any event, as I read the record, there are several material issues of fact that make summary judgment inappropriate. *See Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn. 1995) ("Summary judgment is appropriate where there are no genuine issues of materi-

al fact * * *."). For example, although other employees had reported the firm's practice of imposing a surcharge for telephone calls, in effect secretly reducing employee compensation, it was still continuing at the time appellant questioned the practice. The surcharge on client billings also continued, and this raised a question of fair dealing with a group of which appellant was not a member. In addition, the complexity of the allegedly discriminatory practices precludes summary judgment.

That I dissent represents no conclusion as to the merits of appellant's claim.