Marguerite ANDERSON–JOHAN-
NINGMEIER, et al., Peti-
tioners, Appellants,

v.

MID–MINNESOTA WOMEN'S
CENTER, INC., et al.,
Respondents.

No. C0–00–164.

Supreme Court of Minnesota.

Jan. 3, 2002.

Judith K. Schermer, Schermer & Guy, PLLP, Minneapolis, for appellants.

Kay Nord Hunt, Stephen C. Rathke, Lommen, Nelson, Cole & Stageberg, PA, Minneapolis, for respondents.

Douglas A. Hedin, Hedin & Goldberg, PA, Minneapolis, for amicus curiae Nat. Employment Lawyers Ass'n.

Heard, considered, and decided by the court en banc.

## OPINION

LANCASTER, Justice.

The issue before us is one of statutory construction. After appellants were fired, they alleged a violation of the whistleblower statute, Minn.Stat. § 181.932, subd. 1(a) (1996), based on their questioning whether another employee was entitled to vacation

pay under the wage and hour laws. After a jury trial, the district court granted judgment notwithstanding the verdict to respondents because the vacation pay practices in this case affected only respondents' employees and thus did not implicate public policy. The court of appeals affirmed, holding that appellants had not demonstrated that their report implicated public policy. *Anderson–Johanningmeier v. Mid–Minnesota Women's Ctr., Inc.*, No. C0–00–164, 2000 WL 1869555, at *1 (Minn. App. Dec. 26, 2000). We must determine whether the protections of the whistleblower statute extend only to employees whose reports of a violation or suspected violation of law implicate public policy. We hold that the whistleblower statute is not so limited and reverse.

Mid–Minnesota Women's Center (MMWC) is a shelter for abused women and their children located in Brainerd, Minnesota.[1] Respondent Louise Seliski has served as MMWC's executive director since 1978. Appellant Kathy Delaney was assistant director and appellant Barb Morrell served as secretary/bookkeeper and administrative assistant. Morrell reported to Delaney. Delaney reported to Seliski. Seliski reported to MMWC's Board of Directors.

In 1995, Delaney approved a request for vacation time submitted by MMWC women's advocate Jennifer Cline. On June 23, 1995, after the approval, Cline submitted her resignation. Cline then took the approved vacation time but returned to work at MMWC for a few days before her employment ended.

On July 10, 1995, while reviewing records to approve the payroll, Seliski questioned Morrell about Cline's vacation pay, conveying to Morrell that Seliski believed that Cline was not entitled to the vacation pay under MMWC policy. Seliski told Morrell not to pay Cline's vacation time. Morrell responded that she did not believe that the MMWC policy barred payment of Cline's vacation time.

After the conversation with Seliski, Morrell told Delaney that Seliski expected Morrell to participate in an illegal activity to keep her job. Morrell decided to call the Minnesota Department of Labor and Industry because "[she] didn't know what law was being broken but [she] really felt that this—this couldn't possibly be legal not to pay something because the policy simply didn't address the issue at all." Delaney supported Morrell's decision to call the labor department. In the telephone call to the labor department, Morrell gave her name, MMWC's name and location, Seliski's name, the circumstances regarding Cline's vacation pay, and the MMWC policy Seliski cited as reason to refuse Cline's vacation pay. The labor department employee said that MMWC needed to pay Cline and that if MMWC did not pay her, Cline would win if she sought compensation for the vacation time.

Still on July 10, 1995, Morrell told Seliski that she had called the labor department and that MMWC had to pay Cline. Seliski responded that MMWC policy did not allow her to authorize payment to Cline, but said that she would seek authorization from MMWC's board to do so.

On July 11, 1995, Delaney met with Seliski and told Seliski that it was illegal not to pay Cline. Seliski responded that she did not have the authority to pay Cline's vacation time. After Delaney and Seliski met, Seliski asked Morrell why Delaney was involved in the issue of Cline's vaca-

---

1. Because we are reviewing the district court's decision to grant judgment notwithstanding the verdict, we present the evidence in the light most favorable to the verdict. *See Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 14 (Minn.1979).

tion pay. Seliski suggested that Morrell and Delaney were "trashing" her,[2] and told Morrell not to call the labor department again without consulting her.

After the conversations with Seliski on July 10 and 11, 1995, Morrell and Delaney claimed that their employment conditions changed for the worse. Morrell described the work atmosphere as "very hostile."

In November 1995, Seliski discussed restructuring the MMWC staff. She talked about using restructuring to terminate employees and told a staff member that she was going to terminate the troublemakers in the course of the staff reorganization. Concerned about the atmosphere at MMWC, Morrell submitted a letter to Seliski on December 1, 1995, in which Morrell complained about several issues, among them the events surrounding Cline's vacation pay. Delaney also submitted a letter to Seliski on December 1, 1995, in which Delaney complained about Seliski.

On December 4, 1995, the MMWC board met and eliminated the positions held by Morrell and Delaney. Less than one year later, six former employees of MMWC, including Morrell and Delaney, filed a complaint against MMWC and Seliski alleging negligent retention, negligent supervision, violation of the whistleblower statute, violation of the Minnesota Human Rights Act (MHRA), interference with contractual relations, and denial of benefits in violation of the federal Employee Retirement Income Security Act. Some counts were asserted by all six former employees; the remaining counts were asserted by subsets of them. On September 30, 1998, the district court granted in part and denied in part defendants' motion for summary judgment. Morrell's whistleblower claim and a subset of the MHRA claims[3] survived.

In October 1998, on the first day of trial of the whistleblower claim, the district court determined that Delaney was also a plaintiff.[4] At the close of evidence, the jury was asked to decide whether Morrell or Delaney "in good faith, report[ed] a violation or a suspected violation of a law or rule governing the payment of vacation pay to her employer or to * * * the Minnesota Department of Labor," and whether the report was a motivating factor in MMWC's or Seliski's decisions to terminate their employment. The jury returned a special verdict finding that Morrell and Delaney each made such a report, but that the reports were not a motivating factor in MMWC's decisions to terminate them. The jury found the reports were, however, a motivating factor in Seliski's decisions to terminate them. The jury awarded $55,000 to Morrell and $33,000 to Delaney for lost earnings and embarrassment and emotional distress.

---

2. "Trashing" at MMWC constituted immediate grounds for dismissal. Delaney described MMWC's "no trashing" policy:

> No trashing meant that we were not supposed to put anybody down; that we were not supposed to say anything negative; that we weren't supposed to have any closed door conversation; we were not supposed to talk out of group meetings; we weren't allowed to say anything outside of the Center that went around in the Center; we were not allowed to contact people outside of the Center.

3. The district court heard the MHRA claims in August 1999 and entered judgment for the defendants. The court of appeals affirmed. *Anderson–Johanningmeier,* 2000 WL 1869555, at *3. That portion of the court of appeals' decision is not before us.

4. Thus, despite the appearance of Anderson–Johanningmeier's name in the case caption, the issue before us does not involve her. Only Delaney and Morrell were plaintiffs in the whistleblower trial.

Respondents moved for judgment notwithstanding the verdict on the grounds that: (1) no law governs vacation pay; (2) appellants' reports did not implicate public policy; (3) Delaney did not make a report; (4) Seliski is not an employer; and (5) no causal connection existed between the controversy surrounding Cline's vacation pay and the decisions to terminate appellants. The district court entered judgment notwithstanding the verdict, citing *Donahue v. Schwegman, Lundberg, Woessner & Kluth, P.A.*, 586 N.W.2d 811 (Minn.App. 1998), *rev. denied* (Minn. Feb. 18, 1999):

> Like the payroll practices in *Donahue* the vacation pay practices in this case only affect the employees of the entities involved in the case. Under the standards enunciated in *Donahue* such internal practices, even if illegal, do not implicate public policy and as a matter of law Plaintiff[s'] whistleblower[ ] claims must fail.

The district court did not address respondents' alternative grounds for judgment notwithstanding the verdict. The court of appeals affirmed on the basis that appellants did not demonstrate that their reports implicated public policy. *Anderson–Johanningmeier*, 2000 WL 1869555, at *1. In other words, the court of appeals found that the whistleblower statute's prohibition of adverse employment actions in response to an employee's report of a violation of law applies only when the employee's report implicates public policy.

■ A district court's grant of judgment notwithstanding the verdict "is a question of law subject to de novo review." *Diesen v. Hessburg*, 455 N.W.2d 446, 449 (Minn.1990). Statutory construction is also a question of law subject to de novo review. *Wilson v. Comm'r of Revenue*, 619 N.W.2d 194, 197–98 (Minn.2000).

■ Respondents maintain that the whistleblower statute contains a public pol-icy requirement, reading the statute in harmony with the public policy exception to the employment at-will doctrine. Traditionally, an "employer-employee relationship is terminable at the will of either; the employer can summarily dismiss the employee, the employee is under no obligation to remain at the job." *Cederstrand v. Lutheran Bhd.*, 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). Under the employment at-will doctrine, an employer can discharge an employee for any reason or for no reason. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn.1983). The court of appeals recognized an exception to the employment at-will doctrine when an employer discharges an employee for reasons that contravene a clear mandate of public policy. *Phipps v. Clark Oil & Ref. Corp.*, 396 N.W.2d 588, 592 (Minn. App.1986), *aff'd*, 408 N.W.2d 569 (Minn. 1987). We granted the petition for review of *Phipps*, but in the interval between oral argument and the release of our opinion, the legislature enacted the whistleblower statute. *Phipps*, 408 N.W.2d at 571. We, therefore, did not resolve whether Minnesota should join the majority of states that had recognized a cause of action for wrongful discharge. *Id.* We agreed, however, that the common law protects those fired for their refusal to violate the law. *Id.* Thus, respondents argue that recognition of a public policy requirement in the whistleblower statute is consistent with the common law.

When we interpret a statute, we must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2000); *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 209 (Minn.2001). We will not disregard the words of a statute if they are free from ambiguity. Minn.Stat. § 645.16; *Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 9 (Minn.2001). Thus, we begin our analysis with the statutory

language. Section 181.932, subd. 1(a), states:

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(a) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official[.]

We repeat here what we stated three years ago: "We conclude that [section 181.932, subd. 1(a) ] clearly and unambiguously protects reports made of a violation of any federal or state law or rule adopted pursuant to law." *Hedglin v. City of Willmar*, 582 N.W.2d 897, 901–02 (Minn.1998). It does not contain an explicit public policy requirement.

Respondents argue that the whistleblower statute's development in case law and statutory amendments reveals that, although it did not explicitly do so, the legislature intended that the statute include a public policy requirement. To address this argument, we review the relevant statutory developments and case law, much of which is in the Minnesota Court of Appeals.

The Minnesota Court of Appeals, as we have noted, recognized a public policy exception to employment at-will before the legislature enacted the whistleblower statute. *See* Act of May 11, 1987, ch. 76, 1987 Minn. Laws 140 (codified as amended at Minn.Stat. §§ 181.931–.935 (2000)); *Phipps*, 396 N.W.2d at 592. Almost three years after *Phipps*, the court of appeals revisited the public policy exception to employment at-will in a case in which an employer eliminated an employee's posi-

tion after the employee reported alleged travel and expense improprieties. *Vonch v. Carlson Cos.*, 439 N.W.2d 406, 407 (Minn.App.), *rev. denied* (Minn. July 12, 1989). Although the case was not brought under the whistleblower statute, the court of appeals cited the statute and concluded that the public policy exception to at-will employment protects the general public and that "[t]he public does not have an interest in a business's internal management problems." *Vonch*, 439 N.W.2d at 407–08. In several cases, federal courts cited *Vonch* as an interpretation of the whistleblower statute. *See Nichols v. Metro. Ctr. for Indep. Living, Inc.*, 50 F.3d 514, 517 (8th Cir.1995); *Morrow v. Air Methods, Inc.*, 884 F.Supp. 1353, 1358 (D.Minn.1995); *Thompson v. Campbell*, 845 F.Supp. 665, 675 n. 9 (D.Minn.1994); *Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A.*, 847 F.Supp. 1437, 1447 (D.Minn.), *aff'd*, 40 F.3d 278 (8th Cir.1994).

We addressed a statutory whistleblower claim in *Williams v. St. Paul Ramsey Medical Center, Inc.*, 551 N.W.2d 483 (Minn.1996). We held in *Williams* that the exclusivity provision of the MHRA barred a separate claim under section 181.932. *Williams*, 551 N.W.2d at 486. In a footnote, we described section 181.932:

The popular title of the [Whistleblower] Act connotes an action by a neutral— one who is not personally and uniquely affronted by the employer's unlawful conduct but rather one who "blows the whistle" for the protection of the general public or, at the least, some third person or persons in addition to the whistleblower. Were it otherwise, every allegedly wrongful termination of employment could, with a bit of ingenuity, be cast as a claim pursuant to Minn.Stat. § 181.932 (1994). Because this case was tried and decided on the basis of exclusivity, we have no occasion to rule on the

validity of the cause of action asserted as a whistleblower's claim in Williams' complaint, but we could, in the alternative, have ruled that no such cause of action exists here.

*Williams,* 551 N.W.2d at 484 n. 1.

In 1998, we decided *Hedglin.* A quote from section 181.932, subd. 1(a), in which we italicized the word "any," began our analysis:

> The whistleblower statute protects reports made in good faith of "a violation or suspected violation of *any* federal or state law or rule adopted pursuant to law." We conclude that this language clearly and unambiguously protects reports made of a violation of any federal or state law or rule adopted pursuant to law.

*Hedglin,* 582 N.W.2d at 901–02 (citation omitted). We explicitly rejected reliance on *Vonch* and *Williams* to "read any additional requirement into the whistleblower statute." *Hedglin,* 582 N.W.2d at 902. Because section 181.932 was not in effect at the time of the employee's report or discharge in *Vonch,* we concluded that "any statements made by the *Vonch* court do not apply to claims brought specifically under the statute." *Hedglin,* 582 N.W.2d at 903. We reiterated the caution expressed in *Williams* against construing section 181.932 too broadly, but noted that the caution in *Williams* was dictum. *Hedglin,* 582 N.W.2d at 903. Although we held that section 181.932, subd. 1(a), "by its plain language, protects reports made of a violation of any state or federal law or rule adopted pursuant to law," we explicitly declined to decide whether the public policy requirement applied to section 181.932 because the reports at issue in *Hedglin* implicated public policy. *Hedglin,* 582 N.W.2d at 903.

One month after we decided *Hedglin,* the court of appeals addressed the issue we reserved in *Hedglin.* *Bertagnoli v. Carlson Mktg. Group, Inc.,* No. C6–98–541, 1998 WL 665085 (Minn.App. Sept. 18, 1998), *rev. denied* (Minn. Nov. 17, 1998). Based on its plain language, the court of appeals held that the whistleblower statute does not contain a public policy requirement. *Bertagnoli,* 1998 WL 665085, at *5. Three months after *Bertagnoli,* a different panel of the court of appeals held otherwise in a decision relied on by the district court here: "Because interpreting the whistleblower statute to include a public policy requirement supports Minnesota's careful limitation of at-will employment exceptions to further public interest, we also conclude [the employee's] failure to report a practice that implicates public policy leaves her unprotected by the whistleblower statute." *Donahue,* 586 N.W.2d at 814. The employee argued that she reported, in good faith, a statutory violation, "and, because all statutes are designed to protect the public, her report involved the public interest." *Id.* The court rejected this argument:

> [A]lthough the legislature intended the whistleblower statute to bring sweeping protection to employees who report wrongdoing by employers, we do not believe the intent was to obliterate employment at-will. Instead, both the common-law public policy exception and the whistleblower statute only protect employees who expose violations of law designed to promote the public's morals, health, safety and welfare.

*Donahue,* 586 N.W.2d at 814.

Five months after the court of appeals released *Donahue,* the legislature amended section 181.932, subd. 2 (1998), to classify the identity of an employee making a report to a governmental body as "private data on individuals." Act of May 25, 1999, ch. 227, § 14, 1999 Minn. Laws 1609, 1615

16. The amendment did not change section 181.932, subd. 1(a).

▮ Based on the fact that the legislature did not amend section 181.932, subd. 1(a), after *Donahue,* respondents argue that it is the legislature's intent that a report under the whistleblower statute must implicate public policy. "When a court of last resort has construed the language of a law, the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language." Minn.Stat. § 645.17(4) (2000). The court of appeals, however, is not the court of last resort with respect to a statute's construction. *See Wilson,* 619 N.W.2d at 197–98 (stating that statutory construction is a question of law subject to de novo review); *McClain v. Begley,* 465 N.W.2d 680, 682 (Minn.1991) (stating that the supreme court "is not bound by the decision of the court of appeals" on a question of law). Therefore, the principle of statutory construction embodied in section 645.17(4) does not apply to the court of appeals' interpretation of the whistleblower statute in *Donahue.*

Nonetheless, respondents maintain that because we denied review of *Donahue* before the 1999 amendment, the legislature could have viewed *Donahue* as a definitive interpretation of section 181.932, subd. 1(a). However, when this court denies a petition for review, the court "may agree with the result below but not its reasoning, or vice versa, or neither, or may agree with both the result and the reasoning." *Murphy v. Milbank Mut. Ins. Co.,* 388 N.W.2d 732, 739 (Minn.1986). That we denied review of *Donahue* does not give it "any more or less precedential weight than a court of appeals decision from which no review was sought." *Murphy,* 388 N.W.2d at 739.

In addition, our 1998 decision in *Hedglin* would have alerted the legislature that we would not necessarily find *Donahue* persuasive. Had the legislature disagreed with our statements in *Hedglin* concerning the scope of section 181.932, subd. 1(a), the legislature could have amended the statute in 1999. Instead, the legislature made no change to subdivision 1(a) when it amended section 181.932 that year. *See* 1999 Minn. Laws 1615–16. Finally, respondents' argument ignores the conflicting interpretations that confronted the legislature in 1999 in the *Bertagnoli* and *Donahue* decisions. There is simply no basis to assume that the legislature intended to impose a public policy requirement based on the court of appeals' decision in *Donahue.*

We acknowledge the possibility that the legislature enacted section 181.932, subd. 1(a), to codify the court of appeals' decision in *Phipps.* However, we are not free to disregard the words of a statute "under the pretext of pursuing the spirit" if the words are free from ambiguity. Minn. Stat. § 645.16; *Group Health Plan,* 621 N.W.2d at 9. Because section 181.932, subd. 1(a), clearly and unambiguously protects reports made of a violation of any federal or state law or rule adopted pursuant to law, we will not look beyond its text to search for an unexpressed public policy requirement.

Respondents also rely on *Ly v. Nystrom,* 615 N.W.2d 302 (Minn.2000), to support reading a public policy requirement into the whistleblower statute. In *Ly,* we interpreted the private attorney general (AG) statute, which allows persons injured by a violation of laws entrusted for enforcement to the attorney general to bring actions under those laws and recover damages together with costs and attorney fees. *See* Minn.Stat. § 8.31, subd. 3a (2000). We held that the private AG statute applies only to those claimants who demonstrate that their cause of action benefits

the public. *Ly,* 615 N.W.2d at 314. Our holding, therefore, limited the scope of the private AG statute from "any person" injured by a violation of certain laws to those "who demonstrate that their cause of action benefits the public." *Ly,* 615 N.W.2d at 314. Respondents ask us to find a similar limitation in the whistleblower statute.

We are not persuaded by respondents' reliance on *Ly.* In *Ly,* we stated: "Since the Private AG Statute grants private citizens the right to act as a 'private' attorney general, the role and duties of the attorney general with respect to enforcing the fraudulent business practices laws must define the limits of the private claimant under the statute." *Ly,* 615 N.W.2d at 313. "The duty of the attorney general's office * * * is the protection of public rights and the preservation of the interests of the state." *Id.* Consequently, claimants under the private AG statute must show that their cause of action benefits the public. *Ly,* 615 N.W.2d at 313. A claimant under the whistleblower statute, however, does not act as a private attorney general. Thus, the role and duties of the attorney general do not constrain such a claimant. Therefore, we do not find respondents' reliance on *Ly* persuasive.

Finally, respondents argue that in the absence of a public policy requirement to a whistleblower claim, a lawsuit or threatened lawsuit could occur every time an employee is terminated. Section 181.932, subd. 1(a), contains a good faith requirement, however, which serves to limit the nature of actionable claims. *Id.; Obst v. Microtron, Inc.,* 614 N.W.2d 196, 202 (Minn.2000); *see also, Herman v. Dep't of Justice,* 193 F.3d 1375, 1381 (Fed.Cir.1999) (interpreting the federal Whistleblower Protection Act and holding that an employee could not have had a reasonable belief that an agency violated a law, rule, or regulation because the agency's actions were trivial); *Frederick v. Dep't of Justice,* 73 F.3d 349, 353 (Fed.Cir.1996) ("[T]he alleged action by [the agent] was of such a trivial nature that [the whistleblower] could not have had a reasonable belief that [the agent] was violating a law, rule, or regulation within the meaning of the [federal Whistleblower Protection Act].").

In sum, we reject the importation of a public policy requirement into the whistleblower statute and hold that the protections of section 181.932, subd. 1(a), are not limited to reports that implicate public policy. Because the lower courts did not address respondents' alternative grounds for judgment notwithstanding the verdict, we remand the case to the district court.

Reversed and remanded.

BLATZ, Chief Justice (concurring).

While I agree with the reasoning and conclusion of the majority opinion, I write separately to underscore my concern regarding respondents' request to have a public policy requirement read into the whistleblower statute. The respondents contend that a public policy requirement is needed because, without one, an employee's "mere internal dispute over matters of office and personnel management can easily be recast as a [whistleblower] claim," forcing courts into the role of "super-personnel departments." That, indeed, is a risk that may loom on the horizon. But standing in its shadows is a risk that I believe could present even greater challenges to the judiciary—and that is the risk of being saddled with the ultimate responsibility for determining what employers' decisions contravene "a clear mandate of public policy." *See Phipps v. Clark Oil & Ref. Corp.,* 396 N.W.2d 588, 592 (Minn.App.1986), *aff'd,* 408 N.W.2d 569 (Minn.1987).

278

In their argument that a public policy requirement is embodied in the whistle-blower statute, the respondents suggest that it is "naïve" to conclude that "all laws and regulations" should create whistle-blower liability. For this proposition, the respondents rely on, and liberally quote from, an article cited by the court of appeals in a special concurrence. *See Bertagnoli v. Carlson Mktg. Group, Inc.*, No. C6–98–541, 1998 WL 665085, at *5 (Minn. App. Sept. 18, 1998) (Short, J., concurring specially) (citing James H. Kaster, *Putting "Public Policy" Back into Minnesota's Whistleblower Statute*, Hennepin Law., June 1998, at 4–5). When discussing the "whistle-blower dilemma," the author of the article, James Kaster, notes that "[l]aws and regulations are passed for less-than-noble reasons all the time. Sometimes it is difficult to see the health, safety, and welfare reasons behind certain pork-barrel legislation." Kaster, at 7. Building upon this observation, respondents embrace a public policy requirement and assert that "it is not difficult to distinguish between situations which involve only the private * * * interests of the employer-employee relationship and those situations involving the direct interests of the general public—i.e., matters dealing with public morals, health, safety and welfare."

The respondents' confidence that such lines of demarcation can be so easily drawn minimizes the difficulty of the responsibility they are urging upon the courts. Recognizing that much legislation is hotly contested, are the courts to sit as a "super legislature" to pass muster on the worthiness of a law? And in divining what laws in fact do not embody public policy, will the courts become an unwitting partner with a minority of legislators who were unsuccessful in their attempts to block a bill's passage? These concerns—in conjunction with an appreciation that what one court may view as "pork" may be gruel in the eyes of legislators working on behalf of their constituents—give me great pause. While we will defer to the legislature's wisdom in deciding how expansive or narrow it wishes to make the whistle-blower statute, flares must be lit to mark the perilous road that the courts will have to maneuver if a public policy provision is adopted. It is for this reason that I write separately.