Michael OBST, Appellant,

v.

MICROTRON, INC., Respondent.

No. CX–98–798.

Supreme Court of Minnesota.

June 29, 2000.

Thomas P. Kane and David M. Wilk, Oppenheimer, Wolff & Donnelly LLP, St. Paul, for appellant.

Eric J. Magnuson, Daniel Q. Poretti and Brian K. Jackson, Rider, Bennett, Egan & Arundel LLP, Larry E. Reed, Hassan & Reed Ltd., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Appellant, Michael Obst, filed suit against his former employer, Respondent, Microtron, Inc., for retaliatory discharge [1] in violation of Minnesota's whistle-blower statute, Minn.Stat. § 181.932, subd. 1(a) (1998).[2] The matter proceeded to trial and the jury found in favor of Obst. Microtron then moved for judgment notwithstanding the verdict, or in the alternative, a new trial, both of which the trial court denied. On appeal, the court of appeals reversed based on its conclusion that Obst failed to establish a violation of the whistle-blower statute. We affirm.

---

1.  In this lawsuit, Obst also asserted claims for defamation, age discrimination and race discrimination. Those claims are not part of this appeal and will not be discussed further.

2.  Minn.Stat. § 181.932 provides in relevant part:

    Subdivision 1 An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

    (a) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official[.]

Obst began working for Microtron as Microtron's quality assurance manager in March 1992. Obst reported to Keith Horton, vice president and general manager of Microtron. Microtron is a manufacturer of electronic components for the automobile industry. One of the electronic components Microtron manufactured was the wiper control module, a part used in motor vehicle windshield wiper and washer systems. Performance and design requirements for windshield wiper and washer systems are governed by federal regulations. Microtron began manufacturing wiper control modules for the Ford Motor Company in 1993. A manufacturing control plan developed by Microtron, in conjunction with Ford, set out in detail the individual steps of the manufacturing process Microtron was to follow, including specific procedures for testing finished wiper control modules. Changes to or deviations from the procedures set out in the control plan generally required Microtron to get advance approval from Ford.

According to the control plan, Microtron was required to test the finished wiper control modules using three different methods. First, every wiper control module was to be tested using what is referred to as the end-of-the-line tester. The functions tested by the end-of-the-line tester were: high speed operation; washer operation; maximum dwell time; wire scan; power consumption; minimum dwell time; wipe after wash; park operation; and low speed operation. The end-of-the-line tester was capable of testing multiple wiper control modules at one time. Microtron experienced problems with its end-of-the-line tester from the beginning of wiper control module production. The tester rarely ran at full capacity and broke down frequently. It also passed defective wiper control modules and failed wiper control modules that were not defective.

The control plan also called for ten finished wiper control modules from every carton of wiper control modules produced to be tested by a tester referred to as an audit tester. The functions tested by the audit tester were the same as the functions tested by the end-of-the-line tester with the exception of low speed operation, which the control plan did not require for audit tests.

Finally, the control plan called for the use of a durability tester to test 24 wiper control modules per week. The control plan called for the durability tester to test the following functions: minimum dwell time (2000 cycles); high speed (2500 cycles); and washer activation from off (1500 cycles). The durability tests were to be conducted at temperatures between 25° and 10° Celsius.

In the Fall of 1994, Ford engineers modified the design of the wiper control module causing Microtron to become concerned that there would be an increase in the number of wiper control modules with electrical defects known as solder shorts. Microtron shared this concern with Ford. After the design change, consistent with Microtron's concerns, there was a marked increase in the number of defective wiper control modules produced with solder shorts. At the same time, Microtron began having more problems with the end-of-the-line tester. As a result, the number of defective wiper control modules showing up in tests performed by Ford on its finished vehicles increased dramatically. As early as December 1994, Microtron began receiving communications from Ford manufacturing plants regarding the increased number of defective wiper control modules they were receiving.

On January 24, 1995, Microtron's end-of-the-line tester failed completely and Obst was asked to authorize a deviation from the control plan that would allow the use of the durability tester in its place. Obst initially refused to authorize the deviation and told Horton that they could not proceed with the proposed deviation because it violated the control plan. Horton responded that wiper control modules had to be shipped. Obst then authorized the deviation. Microtron did not, at that time,

take any action to inform Ford about the deviation from the control plan or get approval for it.

On or about February 17, 1995, Microtron received notice from Ford's Michigan truck assembly plant that wiper control modules received from Microtron were failing tests conducted at the plant at an unacceptably high rate. In a series of meetings beginning that day, Microtron developed a plan to respond to the complaint from the Michigan assembly plant, as well as complaints it had received from other Ford assembly plants. The plan called for Microtron to tell Ford that after analyzing some of the wiper control modules returned by the Michigan plant, they discovered that the end-of-the-line tester was allowing wiper control modules with solder shorts to pass inspection. Further, the plan called for Microtron to tell Ford that Microtron would be using the durability tester and the audit tester to certify the quality of the wiper control modules. The plan did not call for Microtron to tell Ford, and Microtron did not tell Ford, that the end-of-the-line tester had not been working since January 24, 1995 or that they had been using the durability tester to test wiper control modules since that time. According to Obst, he told the people at the meetings that because wiper control modules were safety critical parts regulated by federal law, they had to "come clean" with Ford and tell Ford that Microtron had shut down the end-of-the-line tester on January 24 and that Microtron had been deviating from the control plan without authorization since that time.

The plan was communicated to Ford by telephone and confirming letter. The letter noted that Microtron would be seeking formal approval from Ford for its deviation from the control plan. From the record, it appears that Ford ultimately approved Microtron's plan of using the durability and audit testers in place of the end-of-the-line tester.

Obst testified that he believed that Microtron's plan was nothing more than an orchestrated cover-up to prevent Ford from finding out that Microtron had been using the durability tester instead of the end-of-the-line tester since January 24, 1995. Obst also believed that because the wiper control modules were a part of the windshield wiper and washer system, whose performance was regulated by federal law, Microtron was required to use only the end-of-the-line tester to test the finished wiper control modules.

On June 1, 1995, Microtron terminated Obst's employment. According to Horton, Obst was terminated because of his inability to effectively communicate with his peers. Obst believed that the reason Horton gave for his termination was pretextual and that the actual reason was the fact that he reported what he thought were violations of law to Microtron. In support of that belief, he points out that all of his performance reviews at Microtron were good and none ever mentioned him having an inability to effectively communicate. He further points out that only a month before he was terminated, he received a three percent pay raise.

This case comes to us on the court of appeals reversal of the trial court's denial of Microtron's motion for judgment notwithstanding the verdict. In *Pouliot v. Fitzsimmons*, 582 N.W.2d 221 (Minn. 1998), we set out the trial court's standard for considering a motion for judgment notwithstanding the verdict as well as the appellate standard of review when a judgment notwithstanding the verdict has been denied by the trial court. We said:

> [w]hen the trial court considers a motion for JNOV it must determine whether, viewing the evidence in the light most favorable to the nonmoving party, the verdict is manifestly against the entire evidence or whether despite the jury's findings of fact the moving party is entitled judgment (*sic*) as a matter of law. *Dean v. Weisbrod*, 300 Minn. 37, 41–42, 217 N.W.2d 739, 742 (1974). Therefore the standard of review is de novo. *Diesen v. Hessburg*, 455 N.W.2d 446, 449

(Minn.1990). Where JNOV has been denied by the trial court, on appellate review the trial court must be affirmed, if, in the record, "there is any competent evidence reasonably tending to sustain the verdict. 'Unless the evidence is practically conclusive against the verdict, [this court] will not set the verdict aside.'" *Rettman v. City of Litchfield,* 354 N.W.2d 426, 429 (Minn.1984) (quoting *Sandhofer v. Abbott–Northwestern Hospital,* 283 N.W.2d 362, 365 (Minn. 1979)) (other citations omitted). The evidence must be considered in the light most favorable to the prevailing party and an appellate court must not set the verdict aside if it can be sustained on any reasonable theory of the evidence. *See Stumne v. Village Sports & Gas,* 309 Minn. 551, 552, 243 N.W.2d 329, 330 (1976).

*Id.* at 224.

■ Minnesota's whistle-blower statute protects an employee who, in "good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." *See* Minn.Stat. § 181.932, subd. 1(a) (1998); *see also Hedglin v. City of Willmar,* 582 N.W.2d 897, 901–02 (Minn. 1998). While there need not be an actual violation of law, the reported conduct must at least implicate a violation of law. *See Hedglin,* 582 N.W.2d at 902. When interpreting the whistle-blower statute, we have suggested that it protects the conduct of a neutral party "who 'blows the whistle' for the protection of the general public or, at the least, some third person or persons in addition to the whistleblower." *Williams*

*v. St. Paul Ramsey Med. Ctr., Inc.,* 551 N.W.2d 483, 484 n. 1 (Minn.1996).

In this appeal, Obst asserts two separate claims: 1) that his reports to Microtron about Microtron's deviation from its control plan with Ford, by using the durability tester in place of the failed end-of-the-line tester without informing Ford of that deviation, constituted reports of violations or suspected violations of federal law; and 2) that he made reports to Microtron about defective wiper control modules being shipped to Ford, which he claims also violates federal law.

Specifically, Obst asserts that the conduct he reported to Microtron constituted suspected violations of 49 U.S.C. § 30118(c)(1), which requires a manufacturer of a motor vehicle or replacement equipment for motor vehicles to notify the Secretary of Transportation if it learns that "the vehicle or equipment contains a defect * * * related to motor vehicle safety;" 49 U.S.C. § 30112, which provides that "a person may not manufacture for sale * * *, introduce * * * in interstate commerce" any motor vehicle or motor vehicle equipment unless the vehicle or equipment complies with federal standards; and 49 C.F.R. § 571.104, which sets out design standards for windshield wiping and washing systems as they relate to the frequency, placement, and size of windshield wiping and washing systems.

■ We first address Obst's claim that his reports to Microtron about defective wiper control modules being shipped to Ford constitute good faith reports to his employer of a violation or suspected violation of section 30118(c)(1). Obst presented very little evidence on this issue at trial.[3]

---

3. One piece of evidence relied on by Obst to support his claim that Microtron was manufacturing and shipping defective wiper control modules was trial exhibit 6, a June 6, 1995 QOS Report, regarding wiper control modules, sent by Microtron to Ford. The wiper control module monthly summary from the report shows, among other things, total number of wiper control modules tested for certain defects each month between July 1994

and May 1995 and the total rejected. In addition, the summary shows Microtron's composite manufacturing goal and the composite yield for each of these months. While Microtron has not made the argument and it is not the basis for our decision in this case, it is not at all clear, based on the numbers from the summary, that the number of defective wiper control modules escaping detection was not de minimus.

Obst's theory of the case at trial was that because wiper control modules are safety critical parts governed by federal law, Microtron's use of the durability tester to test the wiper control modules after the end-of-the-line tester broke down on January 24, 1995 violated the control plan and that he was terminated by Microtron because he repeatedly told Microtron that they had to tell Ford the truth about their violations of the control plan. In fact, when asked specifically what Microtron did that violated federal law, Obst testified:

A [The violation of federal law was] that they did not immediately cease production, that they did not on the 22nd of February stop shipping product.

Q "They"?

A Microtron, as an organization, as a tier one supplier to Ford.

Q Let's go back and use this hypothetical: What if they didn't—let's accept your version—even if the machine was shut down on January 24th and Ford was not notified until February 24th, and we'll go further with your version, that you had authorized the use of the durability tester and audit tester, how is that a violation of federal law?

A Because the control plan was being violated, because the end-of-the-line tester was not being utilized, because the audit tester was not being utilized.

In essence, Obst took the position that Microtron's deviation from the control plan is the violation or suspected violation of federal law. At oral argument, counsel for Obst emphasized that Obst was trying to get Microtron to tell Ford the truth and to "come clean" regarding its failure to properly test wiper control modules after the end-of-the-line tester broke down in January 1995.

In resolving Obst's claim regarding the shipment of defective wiper control modules, we will assume that the record contains sufficient evidence supporting Obst's claim that he made such reports to Microtron and that this claim was sufficiently

F4TF WCM
Monthly Summary

| COMPOSITE GOAL | 0.98 | 0.98 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 |

| | Jul-9 | Aug-94 | Sep-94 | Oct-94 | Nov-94 | Dec-94 | Jan-95 | Feb-95 | Mar-95 | Apr-95 | May-95 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Radial | 99.93 | 99.94% | 99.89% | 99.87% | 99.88% | 99.80% | 99.77% | 99.43% | 99.83% | 99.76% | 99.77% |
| Post-Wave/Conn | 99.99 | 99.96% | 99.99% | 100.00% | 100.00% | 99.98% | 99.91% | 99.56% | 98.71% | 99.29% | 98.71% |
| Final | 100.00 | 99.98% | 100.00% | 99.99% | 99.98% | 99.46% | 99.29% | 99.52% | 99.37% | 99.38% | 99.79% |
| Total Rejected | | 11 | 0 | 7 | 13 | 317 | 460 | 340 | 464 | 419 | 176 |
| Total Tested | 4459 | 66020 | 68041 | 73833 | 70049 | 58256 | 64954 | 70298 | 73690 | 68067 | 83193 |
| | | | | | | | | | | | |
| COMPOSITE YIELD | 99.92 | 99.88% | 99.88% | 99.86% | 99.86% | 99.24% | 98.97% | 98.51% | 97.92% | 98.44% | 98.28% |

raised at trial. We will also assume, without deciding, that wiper control modules as manufactured by Microtron are governed by 49 U.S.C. § 30118(c)(1) and that the defects reported to Microtron would trigger the notification requirements of section 30118.

Under the whistle-blower statute, establishing that an employee reported violations or suspected violations of law to his or her employer does not end the inquiry. The critical question of whether those reports were made in good faith must also be answered. In order to determine whether a report of a violation or suspected violation of law is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making the report. The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality. *See* Minn. Stat. § 181.932, subd. 1(a). We look at the reporter's purpose at the time the reports were made, not after subsequent events have transpired. *See generally Wolcott v. Champion Intern. Corp.*, 691 F.Supp. 1052, 1059 (W.D.Mich.1987) (holding that the good faith requirement of the whistle-blower statute was not met where the purpose of the employee, at the time of the making of reports, was not to protect the public, but to protect the jobs of himself and his co-workers). In part, the rationale for looking at the reporter's purpose at the time the report is made is to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-blowing claim.[4]

Section 30118(c)(1) requires a manufacturer of motor vehicles or replacement equipment to notify the Secretary of Transportation, as well as the "owners, purchasers and dealers of the vehicle or equipment," of a safety-related defect. Our reading of section 30118(c)(1) and our review of the record leads us to conclude that section 30118(c)(1) was not implicated by Obst's reports. We base that conclusion on three aspects of the reports. First, the specific nature of Obst's reports to Microtron was that Microtron shipped defective wiper control modules to Ford after deviating from the control plan *without informing Ford.* Second, Obst's stated purpose in making the reports was *to have Ford informed* of Microtron's deviation from the control plan. Finally, at no time did Obst ever indicate that his purpose was to have his reports *go beyond Ford* or to have either Microtron or Ford inform the Secretary of Transportation or anyone else of Microtron's shipment of defective wiper control modules.

According to Obst, his stated purpose in making the reports to Microtron was to have Ford informed that Microtron was shipping wiper control modules in violation of the control plan's testing requirements. Based on Obst's stated purpose, it is difficult, if not impossible, to say that at the time the reports were made, his purpose was to expose an illegality as required for protection under our whistle-blower statute. At the time the reports were made to Microtron, Ford was well aware that Microtron was shipping and it was receiving defective wiper control modules. Moreover, at the time Obst made the reports, Obst, as well as Microtron, knew that Ford was aware that Microtron was shipping defective wiper control modules and that the number was increasing. It was Ford,

---

**4.** Microtron, in its argument to this court, contends that Obst's claims of violations of federal law were made up by his attorneys not only long after the reports were made but long after his employment at Microtron had ended. While that is not the basis for our decision, we note that in whistle-blower cases there is a danger of that happening. That danger is best illustrated by the dissent's suggestion that Obst's reports "may also implicate other statutes." Evidently, the dissent would have this case resolved on the basis of those statutes. Clearly, on the facts presented, any such statutes could not have formed the basis for Obst's reports and therefore cannot support Obst's whistle-blower claim.

beginning in December 1994, that notified Microtron about the problem with the defective wiper control modules. Given Ford's knowledge about the defective wiper control modules being shipped by Microtron and Obst's stated purpose in making the reports to Microtron, it would seem that there was no whistle to blow.

This is not to say that whenever an employer establishes that it or another entity receiving a report of a violation or a suspected violation of law from an employee knows of the violation before the report is made, that the employer can escape liability under the whistle-blower statute.[5] We are only saying that on the facts presented here, Obst cannot be said to have been trying to expose what was so openly known and acknowledged by both Ford and Microtron. Therefore, we conclude, as a matter of law, that Obst's reports to Microtron about Microtron shipping defective wiper control modules to Ford did not constitute good faith reports under the whistle-blower statute. We note that our conclusion does not turn on Obst's knowledge or understanding of 49 U.S.C. § 30118 when making his reports to Microtron. It turns on the content of his reports and his purpose in making the reports at the time they were made.

The dissent relies on *Clarke v. TRW, Inc.*, 921 F.Supp. 927 (N.D.N.Y.1996) to support its contention that allegations that a manufacturer of motor vehicle component parts who failed to follow agreed upon testing procedures could constitute a reportable defect[6] under section 30118(c)(1). In the process, a critical distinction between *Clarke* and this case is glossed over. The issue presented in *Clarke* was whether the allegations contained in a proposed amended complaint were sufficient to survive a motion to dismiss for failure to state a claim. *See* 921 F.Supp. at 932. In making that determination, the court was required to accept as true all of the proposed complaint's factual allegations and to draw all reasonable inferences in favor of the plaintiffs. *See id.* In effect, the court was required to assume the plaintiffs would prove their allegations at trial.

That is not the posture of this case, where we know what Obst proved at trial. We know that Obst failed to prove that he reported an illegality within the meaning of the whistle-blower statute where knowledge of the defect he reported was widespread. Whereas the plaintiffs in *Clarke* could simply allege good faith to amend their complaint, Obst had to prove it at trial to avoid judgment notwithstanding the verdict.

■ While Ford knew about the defective wiper control modules, Ford apparently did not know about Microtron's deviation from the control plan. This fact is at the heart of Obst's claim. The court of appeals concluded that Microtron's failure to follow the control plan and to notify Ford of its deviation from the control plan did not implicate any state or federal law. The court of appeals therefore held that Obst's whistle-blower claim failed because he did not make out a *prima facie* case under the whistle-blower statute.

---

**5.** We can think of a number of situations in which the employer's previous knowledge might not lead to the conclusion that the employee lacked good faith in reporting. For example, there may be instances in which the employee is unaware that the employer already knows of the alleged violation and the employee otherwise acts in good faith. Or there may be instances in which the employee, aware that the employer has knowledge of the alleged violation, in addition to reporting to the employer, also reports to a governmental body or law enforcement official.

**6.** The dissent misstates the court's ruling in *Clarke*. The dissent claims that the court in *Clarke* held that defects in testing constituted reportable defects under 49 U.S.C. § 30116(a)(1) and 30118(c)(1). In fact, the court found that both construction and performance defects met the regulatory definition, and did not hold that testing defects met the standard. The court simply noted that plaintiff alleged testing deficiencies. *See* 921 F.Supp. at 934.

Obst contends. that Microtron's deviation from the control plan's testing procedures constitutes a violation or suspected violation of 49 U.S.C. § 30112(a) and 49 C.F.R. § 571.104. Section 30112 prohibits the introduction of motor vehicle equipment into interstate commerce that does not comply with federal standards. As applied to Obst's claim, those standards, set out at 49 C.F.R. § 571.104, relate only to the frequency, placement and size of windshield washing and wiping systems and do not address wiper control modules or require particular tests or procedures for testing wiper control modules. The one reference to testing in the standards relates to the "frequencies or speeds" of windshield wiping systems and makes clear that the testing is permissive.[7] Had the drafters of these standards intended for them to address testing procedures for wiper control modules, they could easily have done so, but did not. Moreover, neither the parties nor our own research has identified any case law linking either the statute or the regulation to wiper control module testing. Finally, we note that even if Obst could establish that 49 C.F.R. § 571.104 addressed testing procedures, his claim would still fail. The applicability of 49 C.F.R. § 571.104 and by reference 49 U.S.C. § 30112(a) to motor vehicles and their component parts is governed by 49 C.F.R. § 571.7, which states that "each standard * * * applies according to its terms to all motor vehicles or items of motor vehicle equipment." *See also Clarke*, 921 F.Supp. at 935. By its express terms, 49 C.F.R. § 571.104 applies to windshield wiping and washing systems in finished motor vehicles[8] and not to a vehicle's component parts. *See* 49 C.F.R. § 571.104 S2. Thus, Obst has not demonstrated that his reports to Microtron implicated a violation of either 49 U.S.C. § 30112(a) or 49 C.F.R. § 571.104.

■ While Microtron's deviation from the testing procedures set out in its control plan with Ford may have implicated a violation of the control plan or a breach of its contract with Ford, the deviation did not implicate a violation of law. Moreover, while the alleged control plan violations may have permitted defective wiper control modules to escape detection, there is nothing in the record before us suggesting that they caused or in any way contributed to those defects. Certainly, the performance of wiper control modules raises safety concerns. However, to say that safety concerns are raised does not satisfy the requirement of the whistle-blower statute, that the employee's reports must implicate a violation or suspected violation of a federal or state law or rule adopted pursuant to law. *See Hedglin*, 582 N.W.2d at 902; *see also* Minn.Stat. § 181.932, subd. 1(a). The dissent asserts that *Hedglin* does not require us to find a law implicated by the conduct reported when the employee's belief that a law was violated was held in good faith. The dissent is simply wrong on this point. In *Hedglin*, we concluded that reports by two firefighters that "some of the fire officers were showing up at fire calls while drunk" were not protected by the whistle-blower statute because we were not directed to, nor could we find any statute or rule violated by the alleged conduct. *See Hedglin*, 582 N.W.2d at 902. In contrast, we concluded that reports of firefighters driving fire trucks while drunk implicated "possible" violations of identified state laws. *See id.* Thus, it is clear that the report. of a suspected violation of federal or state law must implicate an actual federal or state law and not one that does not exist.

Obst's failure to establish that his reports to Microtron implicated a violation or suspected violation of an actual law means that the jury's verdict cannot be sustained

---

**7.** "Compliance with subparagraphs S4.1.1.2 and S4.1.1.3 *may* be demonstrated by testing * * *." 49 C.F.R. § 571.104 S4.1.1.4 (emphasis added).

**8.** This regulation applies to passenger cars, multipurpose passenger vehicles, trucks, and buses.

on any reasonable theory of the evidence. *See Stumne,* 309 Minn. at 552, 243 N.W.2d at 330. Because we conclude that the jury's verdict cannot be sustained on any reasonable theory of the evidence, Microtron is entitled to judgment notwithstanding the verdict as a matter of law.

Affirmed.

GILBERT, Justice (dissenting).

I respectfully dissent. The majority opinion now places the burden for proving actual violations of the law on those employees for whom whistle-blower protections were enacted. In doing so, it ignores an apposite federal court interpretation of the same federal statute at issue. The jury's finding of a good faith report of suspected violations is then set aside by the majority after the trial court denied Microtron's motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

When the trial court has denied a motion for judgment notwithstanding the verdict, our standard of review is to determine whether there is any evidence in the record tending to sustain the verdict. *See Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn.1998). While the majority claims that its conclusions in this matter are a "matter of law," it appears to substitute its conclusions for the findings of the jury on "the critical question of whether those reports were made in good faith."

The jury, properly instructed by the trial court, answered that critical question. The jury, in its special verdict form, found that Obst had made a good faith report of a suspected violation of law to Microtron and Keith Horton. It also found that Obst was terminated because, in good faith, he reported a suspected violation to both Microtron and Horton. The majority, after its own analysis of the content of the report and the reporter's purpose in making the report, coupled with a technical review of 49 U.S.C. § 30118(c)(1), concludes as a matter of law that Obst could not have

made a good faith report of a suspected violation.

However, federal courts interpreting the same federal statutes have reached the opposite conclusion on this matter of law. In a similar whistle-blower action under New York law, the U.S. District Court for the Northern District of New York concluded that allegations that a manufacturer of motor vehicle component parts failed to follow agreed-on performance testing procedures could constitute a defect within the meaning of 49 U.S.C. § 30102(2). *See Clarke v. TRW, Inc.,* 921 F.Supp. 927, 935 (N.D.N.Y.1996).

In *Clarke,* the plaintiffs alleged that they had been wrongfully discharged under New York Labor Law § 740 for reporting to their supervisors testing and manufacturing deficiencies in motor vehicle component parts. 921 F.Supp. at 930–31. Specifically, two plaintiffs alleged that they were retaliated against and discharged from employment for reporting their employer's failure to follow testing and manufacturing specifications that the employer and its customer agreed on. *See id.* New York Labor Law § 740 requires that a plaintiff in a whistle-blower action allege an actual violation of "a law, rule or regulation" to sustain an action. *Clarke,* 921 F.Supp. at 933.

The central question in *Clarke* was whether the plaintiffs' alleged facts were sufficient to support a claim that their employer had violated 49 U.S.C. §§ 30116(a)(1) or 30118(c)(1). 921 F.Supp. at 933–35 (noting that section 30116(a)(1) requires a manufacturer to repurchase defective motor vehicle equipment and section 30118(c)(1) requires the manufacturer to notify the secretary of transportation of such defective equipment). The employer argued that there was not "an actual violation of the law" nor did the practice "present[ ] an actual danger to the public health or safety." *Clarke,* 921 F.Supp. at 933. It further argued that because the allegations only related to testing and manufacturing procedures, they did not allege "defects"

as defined by 49 U.S.C. § 30102(a)(2). *See Clarke*, 921 F.Supp. at 934. The court disagreed and found that the allegations of "fundamental construction and testing defects" met the definition of defect in section 30102(a)(2), "because that definition includes defects in construction or material of vehicle components." *Clarke*, 921 F.Supp. at 934. Thus, these allegations were sufficient to allege violations of 49 U.S.C. §§ 30116(a)(1) and 30118(c)(1). *See Clarke*, 921 F.Supp. at 934.

The present situation is analogous to that in *Clarke*, but without us having to accept the complaint as being true. While in this case we address whether the district court erred in failing to grant judgment notwithstanding the verdict, our analysis is similar to that in *Clarke* with the benefit of the jury having found the allegations to be true. In *Clarke*, the proposed complaint, alleging that a New York manufacturer's products suffered from "fundamental construction and testing defects," was held to be sufficient to sustain a whistle-blower claim that the employer's actions violated section 30118(c)(1).

Similarly, the jury's finding of a good faith report of a suspected violation should be sustained under these facts. There is evidence in the record demonstrating that it was Obst's purpose to expose the fact that Microtron was not following the agreed-upon control plan or testing procedure, something that Ford Motor Company was not aware of and that Microtron was intent on keeping from Ford. There was also evidence of defects in the construction of the components and that Obst reasonably believed that Microtron's failure to follow the control plan, or at least that Microtron's attempts to conceal this failure from Ford, violated federal law. It is significant that while the majority turns to a federal case to support its contentions regarding Obst's purpose, the majority disregards a federal case resolving the specific issue before it.

Additionally, the majority does not address the fact that the jury also found that Obst was fired for making this report. The record clearly supports this conclusion as well. Evidence was introduced showing that the Ford contract accounted for nearly half of Microtron's sales. Obst also testified that he was told that not shipping these products to Ford was "not an option" and that Ford would shut Microtron down if they found out that proper inspection procedures were not being followed. There is also evidence in the record that Microtron supplied false information to Ford to conceal its failure to follow the control plan.

The majority, citing generally to a 1987 case from the Western District of Michigan, *Wolcott v. Champion Intern. Corp.*, 691 F.Supp. 1052, 1059 (W.D.Mich.1987), claims to look at Obst's purpose for making his report, at the time he made it, to determine whether that report was made in good faith. (In *Wolcott*, the report related to protecting jobs, not to protecting the overall public.) We have never adopted this rule before and the whistle-blower statute does not mandate that we do so now. The majority's analysis on this point is based on its own factual determination about Obst's purpose in his communications with Microtron. However, we are not finders of fact. Rather, our standard of review requires us only to look to the record to determine whether there are any facts tending to support the verdict. *See Pouliot*, 582 N.W.2d at 224. The majority concludes that because "knowledge of the defect he reported was widespread," Obst failed to prove he reported an illegality within the whistleblower statute. However, just because others may have known about the defect and deficient testing procedures does not nullify Obst's purpose nor change the requirement to notify the U.S. Secretary of Transportation. Importantly, the majority "assumes, without deciding," that "the defects reported to Microtron would trigger the notification requirements of section 30118." At a minimum, the record on his purpose is a dispute as to the facts that the jury decided.

As such; the findings of the jury must be upheld.

The majority also claims that Minnesota's whistle-blower statute does not contain any protection for a report made by an employee for activity that in and of itself is not a violation of the law, regardless of the employee's good faith belief that it was a violation. I read no such requirement in *Hedglin.* 582 N.W.2d at 902–03. In *Hedglin,* we held it was irrelevant whether there were any actual violations; the only requirement is that the reports of state law violations were made in good faith. *Id.* at 902. After concluding that two of the three claims implicated obvious violations of the law, we did not address whether a cause of action would have existed for a claim that, while certainly implicating public policy concerns, did not appear to violate any statute. *See Hedglin,* 582 N.W.2d at 903.[1] Importantly, the only federal court interpreting this same statute on very similar facts came to the same legal conclusion that Obst came to: that construction and testing defects were sufficient to allege violations of 49 U.S.C. § 30118(c)(1). *See Clarke,* 921 F.Supp. at 934.

Microtron's conduct in this matter supports the jury's finding that Obst's report of testing defects was made in a good faith belief that it was a violation of the law. Microtron knowingly deviated from a control plan designed to assure the shipment of safe parts. Numerous defective parts were shipped. False information was mailed to Ford and 49 U.S.C. § 30118(c)(1) requires the secretary of transportation to be notified by the manufacturer of defective equipment "related to motor vehicle safety." Defective windshield wipers relate to motor vehicle safety as conceded by the majority. This report not only implicates a violation of 49 U.S.C. §§ 30112 and

30118(c)(1), but it may also implicate other statutes.

If, as the majority has done, we are going to engage in this type of an after the fact detailed legal analysis, judging a lay person's understanding of the law, to overturn a jury verdict clearly supported by the record, then we should consider all other possible violations of law presented by the facts. Clearly, there was law supporting Obst's rationale for reporting and he was penalized for making the disclosures. Therefore, we should defer to the findings of the jury in this matter and reverse the court of appeals.

1. We have not decided whether the whistleblower statute also contains the common law protections for reports made in the interests of public policy or whether such claims are

properly brought under a common law action for wrongful discharge. I would not have us decide this question today.