# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2012

_____

| | | |
|---|---|---|
| Naomi Chial, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Sprint/United Management Company, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 13, 2009
Filed: June 24, 2009

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Naomi Chial appeals from the district court's[1] grant of summary judgment in favor of her former employer, Sprint/United Management Company (Sprint), in this diversity action under the Minnesota Whistleblower Statute, Minn. Stat. § 181.932, and Minnesota's common law. We affirm.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

I.

Sprint is a telecommunications company that sells mobile phones and service contracts. During the relevant time period, Sprint's sales force was organized by store, market, and area. Each store was staffed with a manager, who reported to a retail sales manager. The retail sales manager was responsible for the stores within her market, and she reported to the area retail director, who oversaw all stores and retail sales managers within an area. Compensation for each level of management depended, in part, on the commissions earned by the sales representatives within the respective store, market, or area.

Sales representatives earned a commission based on the monthly recurring charge (MRC) on each new plan they sold, and Sprint tracked and ranked the retail sales managers' average plan MRC. The district court used the following example to illustrate how a salesperson earned a commission on a MRC:

> [I]f a sales representative sold a plan to a customer that obligated the customer to pay $50 per month, that sale's MRC was $50, and the salesperson earned a one-time commission on that $50. (The sales representative did not earn commissions on the continuing monthly revenue generated by that sale; Sprint paid a commission only at the time of the initial sale.)

D. Ct. Order of April 1, 2008, at 2.

At the time relevant to the complaint, Sprint was running an add-a-phone program. Under that program, customers could add a phone to their existing plans for a price less than buying a new, separate plan. "For example, an existing customer with a $50-per-month plan, she might add a second phone to her plan for an additional $10 per month." Id. The existing customer's plan would be considered the primary account, and a new phone line would be added to that account. Before Sprint changed

its compensation plan in October 2004, the MRC and the sales commission were based on the added phone, or $10 in the example.

Chial worked as a retail sales manager for the Twin Cities market. In March or April 2004, Chial and several store managers participated in a conference call regarding Sprint's compensation plan. Jeff Lively, a regional retail sales manager and Chial's peer, presented information and fielded questions. When asked how to increase MRCs, Lively recommended a method for reporting sales under Sprint's add-a-phone program. Lively explained that a salesperson could record the addition of the new phone as a sale of a new primary account. Under this scenario, the primary account holder would not be the existing customer, but rather the individual who was supposed to be added to the existing customer's account. The customer would pay the same monthly charge—$60 in the example—but the MRC would include the value of a new primary account, not just the $10 added phone line. Additionally, the salesperson would earn commission as if this was an entirely new account, even though the customer had intended to add a phone to an existing account.[2]

Chial objected to this practice as unethical and as constituting commissions fraud. She told Lively that she would not permit the sales representatives in her market to participate in it unless she received written authorization from upper management. Shortly after the conference call, Chial contacted Michelle Dunn, her direct supervisor and the area retail director for Sprint's North Central region, and reported the practice. Dunn told Chial that she would look into it. Dunn contacted Dennis Armstrong, the retail finance director at Sprint's headquarters, and asked him to investigate.

Following the conference call with Chial, Lively also sought input about the practice. In an email to Sprint managers, Lively explained the practice and gave two

---

[2]We will refer to the practice described above as the Lively practice.

examples of how the scenario might present itself: (1) the customer has a high-end plan or a family plan and would like to add another phone to the plan; and (2) the customer has a low-end plan with only one phone and the salesperson persuades the customer to upgrade to a high-end plan, adding one or more phones to the new plan. Lively stated that in either scenario, the "customer is not impacted negatively" but that the consensus during the conference call was that the first scenario seemed like commissions fraud. Lively forwarded the email to Chial, who explained that she thought the practice would cause customer confusion. Chial stated her opinion that "this kind of behavior is deception for the customer and the company."

Armstrong eventually joined the discussion and stated that he believed that the practice constituted commissions fraud. Armstrong also contacted Chial and reiterated his opinion that the practice was commissions fraud. In October 2004, Sprint explicitly barred the practice, except in certain circumstances, and changed the compensation plan so that there was no longer a commissions incentive to engage in the practice.

In May 2004, about a month after Chial reported the Lively practice, Dunn gave Chial a verbal warning for poor performance. Dunn summarized the verbal warning in an email to Chial, describing how Chial had failed to meet Sprint's expectations with respect to the company's policies and procedures. In early July 2004, Dunn issued a written warning to Chial for her continued failure to meet objectives. Chial was surprised that she had been given a verbal warning, and the subsequent written warning caused her great anxiety. Due to this work related stress, Chial took medical leave from July through October 2004. Chial returned to work in late October, and shortly thereafter, Dunn reissued Chial's written warning. Chial was given a final warning in November 2004, and she was terminated in January 2005.

Chial sued Sprint in state court alleging, among other things, statutory and common law claims for whistle blowing. Sprint removed the case to federal district

court and later moved for summary judgment. The district court granted Sprint's motion and dismissed the whistle blowing claims because Chial admitted that she did not believe the Lively practice was illegal at the time she made her report.

## II.

We review *de novo* the district court's grant of summary judgment. Hitchcock v. FedEx Ground Package Sys., Inc., 442 F.3d 1104, 1106 (8th Cir. 2006). Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Hitchcock, 442 F.3d at 1106. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986). We view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Hitchcock, 442 F.3d at 1106.

## A.

The Minnesota Whistleblower Statute provides that an employer shall not discharge an employee because the employee, in good faith, reported "a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932, subdiv. 1 (1). The plaintiff employee has the initial burden of establishing a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973); see also Buytendorp v. Extendicare Health Servs., Inc., 498 F.3d 826, 834 (8th Cir. 2007) (applying the McDonnell Douglas burden-shifting framework to claims under the Minnesota Whistleblower Statute); Hitchcock, 442 F.3d at 1106 (same). To do so, she must show that her conduct is statutorily protected, that an adverse employment action was directed at her, and that a causal connection exists between the protected

conduct and the adverse action. <u>Buytendorp</u>, 498 F.3d at 834 (citing <u>Rothmeier v. Inv. Advisers, Inc.</u>, 556 N.W.2d 590, 592-93 (Minn. Ct. App. 1996)).

The statutorily protected conduct at issue in this case is the good faith reporting of a violation or suspected violation of law. <u>See</u> Minn. Stat. § 181.932, subdiv. 1 (1). To constitute whistle blowing, a report must be "made for the purpose of exposing an illegality." <u>Obst v. Microtron, Inc.</u>, 614 N.W.2d 196, 202 (Minn. 2000). In determining whether the employee's report is made in good faith,

> [t]he central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality. . . . We look at the reporter's purpose at the time the reports were made, not after subsequent events have transpired. . . . In part, the rationale for looking at the reporter's purpose at the time the report is made is to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-blowing claim.

<u>Id.</u> (internal citations omitted). Accordingly, for an employee to make a good faith report, she must subjectively believe the conduct is unlawful at the time she makes the report and she must make the report because the conduct is unlawful. <u>See</u> <u>id.</u>

Chial cannot show that she made a good faith report of a violation or suspected violation of law because she did not believe that the Lively practice was unlawful at the time she made the report. In her deposition, Chial testified as follows:

> Q: At the time you made the complaint did you believe that it was a violation of either state or federal law?
>
> A: No.

Chial's testimony answers the usually difficult and fact-based question of whether the employee's subjective motivations qualify her as a whistle blower. Because she did not believe the practice was unlawful when she reported it, she could not have made the report for the purpose of exposing an illegality.

Chial contends that a jury should decide whether she made a good faith report of a violation or suspected violation of law because her purpose in making the report was to do the right thing and call attention to the wrongdoers and because she referred to the practice as commissions fraud. Reporting conduct for purposes other than exposing an illegality, however, is not sufficient to satisfy the good faith requirement under Minnesota law. See Obst, 614 N.W.2d at 202. Chial testified that the Lively practice was wrong, unethical, and commissions fraud. We have reviewed the record carefully, and it appears that Chial formed a belief that the practice was illegal at some point after she reported the practice to Dunn. Although it is unclear when she determined the practice was illegal, her above-quoted testimony makes clear that she did not believe it was illegal at the time she reported it. Because Chial did not make the report for the purposes of exposing an illegality, she did not make a good faith report of a violation or suspected violation of the law. Accordingly, Chial's conduct is not statutorily protected, and the district court properly granted summary judgment in favor of Sprint.[3]

---

[3]We disagree with Chial's argument that she would have to be a lawyer and understand a technical definition of illegal to qualify as a whistle blower. The employee must believe that the reported conduct is against the law at the time she makes her report, but Minnesota law does not require that the employee identify the law that was violated. Obst, 614 N.W.2d at 204; Abraham v. County of Hennepin, 639 N.W.2d 342, 354-55 (Minn. 2002).

B.

Chial also appeals from the district court's dismissal of her common law claim for wrongful discharge in violation of public policy. The Minnesota Supreme Court has held that an employee may bring an action for wrongful discharge if she "is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law." Phipps v. Clark Oil & Refining Corp., 408 N.W.2d 569, 571 (Minn. 1987). Chial argues that the district court erred when it concluded that Chial was not ordered to violate the law. With respect to her common law claim, however, the district court held that it failed on the merits because "Chial did not refuse to participate in the Lively practice on the basis of any good-faith belief that the practice was illegal." D. Ct. Order of April 1, 2008, at 10. Like her statutory claim, Chial's wrongful discharge claim must fail because she did not form her belief that the practice was illegal until after she told Lively that she would not allow the salespeople in her market to engage in it and after she reported the practice to Dunn. Accordingly, the district court properly dismissed Chial's common law claim.

The judgment is affirmed.

_____