*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0849**

Julie Childs,
Appellant,

vs.

Fairview Health Services,
Respondent.

**Filed November 28, 2016
Affirmed
Toussaint, Judge\***

Hennepin County District Court
File No. 27-CV-14-19589

Nicholas G.B. May, Jenny M. Helling, Fabian May & Anderson PLLP, Minneapolis, Minnesota (for appellant)

Paul J. Zech, Randi J. Winter, Meggen E. Lindsay, Felhaber Larson, Minneapolis, Minnesota (for respondent)

Considered and decided by Connolly, Presiding Judge; Reilly, Judge; and Toussaint, Judge.

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**TOUSSAINT**, Judge

Appellant Julie Childs challenges the district court's grant of summary judgment dismissing her retaliation claim under the Minnesota Whistleblower Act against her former employer, respondent Fairview Health Services. Because the district court did not err in concluding that Childs failed to offer evidence to prove a prima facie case under the Minnesota Whistleblower Act, we affirm the grant of summary judgment dismissing Childs's claims.

## DECISION

On appeal from summary judgment, the reviewing court must determine whether there are any genuine issues of material fact and whether the district court erred in applying the law. *Commerce Bank v. W. Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015). The reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted. *Id.*

The Minnesota Whistleblower Act (MWA) prohibits retaliation for:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> > (1) the employee . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer . . . .

Minn. Stat. § 181.932, subd. 1(1) (2014). Minnesota courts apply the three-step procedure set out in *McDonnell Douglas* to retaliation claims. *Cokley v. City of Otsego*, 623 N.W.2d

625, 630 (Minn. App. 2001), *review denied* (Minn. May 15, 2001). The *McDonnell Douglas* burden-shifting procedure requires the complainant to establish a prima facie case, the employer to furnish an answer, and the complainant to rebut that answer. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 807, 93 S. Ct. 1817, 1824, 1826 (1973). To establish a prima facie case under the MWA, a plaintiff must show the following three elements: (1) that the plaintiff engaged in statutorily protected activity; (2) that the employer took adverse employment action; and (3) that there exists a causal connection between the two. *Cokley*, 623 N.W.2d at 630.

The district court determined that Childs failed to present evidence sufficient to establish all three elements of a prima facie case. The district court concluded that Childs did not make a report within the meaning of the MWA, that Childs could not show a causal link between her alleged report and ultimate termination, and that Childs failed to demonstrate that the reason Fairview provided for her termination—altering timecards even after being warned it was illegal—was pretextual. A review of the record reveals that no genuine issues of material fact exist.

Childs argues that caselaw interpreting the term "report" was abrogated by the legislature's amendment of the MWA to add a definition for good faith. The legislature amended the MWA in 2013 to define good faith as conduct that is not knowingly false or in reckless disregard of the truth. Minn. Stat. §§ 181.931, subd. 4, .932, subd. 3 (2014). But the addition of a definition of good faith does not abrogate prior MWA-related precedent. "[L]ogically, defining a term that has already been used in a statute for several years should clarify rather than substantively change that statute." *Carlson v. Lilyerd*, 449

3

N.W.2d 185, 191-92 (Minn. App. 1989), *review denied* (Minn. Mar. 8, 1990). Therefore, the clarification to the definition of good faith does not erase the common-law interpretation of a statutorily protected report, and Childs's argument fails.

**I.     Childs did not engage in statutorily protected activity.**

We must first address whether Childs engaged in statutorily protected activity. We must look at both the alleged report's content and Childs's purpose in making the report at the time she made it. *Gee v. Minn. State Colleges & Univs.*, 700 N.W.2d 548, 555 (Minn. App. 2005). A report must be made for the "purpose of exposing an illegality." *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202 (Minn. 2000). We determine whether a document constitutes a statutorily defined report as a matter of law. *Cokley*, 623 N.W.2d at 630.

**A.     Childs did not write the April 24, 2014 e-mail to expose illegality.**

Childs's first claimed whistleblower report is an April 24, 2014 e-mail. As part of Childs's job, she communicated with her supervisor, Carla Olson, about whether to admit certain patients to Fairview's adolescent chemical dependency lodging program. But in Childs's April 24 e-mail, Childs included both Kathy Knight, Olson's superior, and Dr. H. Berit Midelfort, the medical director of the lodging program, to which Olson reacted in what Childs perceived as "a reprimanding tone." Childs's following e-mails all attempt to justify her inclusion of Knight on the e-mail, including statements to Knight such as, "[Y]ou have told me in the past that I could always include you in these types of decisions." Childs also discussed how she feared potential *personal* liability if an unqualified patient was admitted, stating that if she had accepted a client that did not meet criteria, "[she] would certainly be questioned why [she] felt as though [she] could make that decision."

4

And when Childs did discuss her concerns about a patient, it was simply to validate why she had included Knight and Dr. Midelfort on this e-mail. These facts do not point to a motive of exposing illegality, but rather a motive of protecting oneself from potential blame and justifying the inclusion of superiors on an e-mail. Therefore, this e-mail does not constitute statutorily protected conduct.

**B.      Childs did not write the July 13, 2014 letter to expose illegality.**

Childs next argues that a letter she wrote on July 13 was a protected report under the MWA. Childs sent this letter to both Knight and Kim Engelhart in human resources. In Childs's opening and closing paragraphs, she discussed her scheduling change and how this was "[t]he last straw" in her decision to write the letter. Childs discussed how she had had her prior schedule for 15 years, and how this scheduling change would disrupt her private practice. Childs said that she "deserve[d] a good explanation for the timing of this abrupt schedule change" and that her "wish [was] that the decision to change my work schedule be reconsidered." She also requested in the letter that she be provided with at least a six-month period before the change in schedule went into effect so that she could adjust her private practice. In the letter, Childs additionally defended herself against her employee's complaints about unavailability, saying that she did not need to "justify why [she was] in [her] office." She discussed how when her staff feels overwhelmed, "they want [her] to step in to help them do their jobs" and that she felt like a "scapegoat in an overall stressful work environment." And finally, an overwhelming portion of Childs's letter was a discussion of her relationship with Olson.

5

When Childs cited potential illegality to expose Olson's possible misconduct, she stated, "Admission of inappropriate clients can create unsafe situations which add stress and anxiety to staff who are not trained or equipped to handle these clients." This concern relates more with her staff's stress leading to her schedule change than a whistleblowing situation. Additionally, she stated that "[w]hile [she] always examine[s] any staff concerns, some of the staff complaints are a direct result of stressors associated with the changing census, very challenging and sometimes inappropriately admitted clients for which they are not trained or equipped to deal with." All of these complaints relate only to violations of internal policies, and as a result do not constitute statutorily protected activity. Because the motive behind this letter does not stem from reporting illegal activity, this letter is not a statutorily protected report.

Childs cannot show statutorily protected activity as her e-mail and letter convey that Childs's motives were to protect herself from potential liability, discuss her unhappiness with Olson, and vent about her dissatisfaction with her schedule change, rather than report illegal activity.

## II. There is no causal connection between Childs's e-mail and letter and her termination.

Because the termination was indisputably an adverse employment action, satisfying the second element of a prima facie case, we can move to the final element: a causal connection. We have held that along with direct evidence, "an employee may demonstrate a causal connection by circumstantial evidence that justifies an inference of retaliatory motive." *Cokley*, 623 N.W.2d at 632. "Speculation, however, is not circumstantial

6

evidence." *Id*. at 633. While "temporal proximity may support an inference of retaliatory motive, . . . usually more than a temporal connection is necessary to create a genuine issue of material fact." *Harnan v. Univ. of St. Thomas*, 776 F. Supp. 2d 938, 948 (D. Minn. 2011) (interpreting Minnesota law and ruling a temporal proximity between a report and termination of two months, alone, is not enough to show causation).

Childs sent her letter, the latest of her alleged "reports," on July 13, 2014, and was terminated on August 26, 2014, creating a one-month gap between the conduct and the adverse action. But just days before her termination, Childs had been caught altering Y.P.'s timecards. This action undermines Childs's argument of a causal connection, as it is intervening, illegal conduct at work.

Childs altered timecards of employees who were punching in before their start time or out after their end time. Y.P. later approached Childs and asked to have every other weekend off. To avoid overtime, Childs manipulated Y.P.'s timecards. Childs was warned that altering timecards was not okay because all employees had to be paid for all time worked. Two weeks before Childs was terminated, Y.P. brought this illegal practice to Engelhart's attention. Engelhart then had a discussion with Olson, Knight, and Engelhart's supervisor and determined that this conduct warranted termination. Childs does not dispute the fact that her actions were illegal and exposed Fairview to liability from employees who were not being paid for hours worked. Exposing her employer to potential liability caused Childs's termination, not her e-mail or letter.

Further evidence that the e-mail and letter did not cause Childs's termination is that Knight took immediate action to address Childs's improper admissions concerns. Knight

7

asked for the names of the patients about whom Childs was concerned and asked an advanced practice registered nurse, certified as a clinical nurse specialist in child adolescent psychiatric mental health nursing, to audit these patients. Knight also set up a meeting between Childs, Engelhart, and Olson to discuss potential issues with the relationship between Childs and Olson and the schedule change about which Childs complained in her letter. Knight additionally organized a meeting to discuss and create a 90-day plan in response to Childs's concerns.

Childs argues that retaliatory animus ultimately caused her termination. But her argument fails. First, her argument that Olson did not want Childs to talk to Knight fails because Olson had only asked Childs why she included Knight on an e-mail that should only have gone to Olson. Second, Childs argues that she never received the benefit of any disciplinary proceedings before her termination, but Fairview does not always conduct such proceedings, and has not in the past for such significant violations as falsifying timecards because it opens Fairview up to potential liability. And third, Childs argues that the 90-day plan was retaliatory, but this plan had been given to other employees and was created in response to Childs's concerns to hopefully get the working relationship between Childs and Olson back on track.

Based on the record, a reasonable finder of fact could not conclude that Childs's e-mail and letter caused her termination.

## III. Childs did not prove that Fairview's reason for firing her was pretextual.

Even if Childs could have made out a prima facie case, the district court did not err in determining that Childs could not show that Fairview's reason for terminating Childs

was pretextual. Fairview met its burden of showing a non-retaliatory reason for termination by arguing that Childs was terminated for altering the timecards illegally despite warnings not to.

Childs argues that this reason is pretextual. An employee may show pretext by demonstrating that the "employer's proffered explanation is unworthy of credence." *Hamblin v. Alliant Techsystems, Inc.*, 636 N.W.2d 150, 153 (Minn. App. 2001), *review denied* (Minn. Feb. 19, 2002). Under the *McDonald-Douglas* framework, an employee may also show pretext by showing that "similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006).

First, Childs argues that Fairview's termination without discipline is evidence of pretext. But Fairview does not always have disciplinary proceedings in situations such as this. Second, Childs argues that Olson gave her permission to alter Y.P.'s timecards. Olson has denied giving such permission. This is a dispute of fact, but not of material fact. Even if Olson gave her permission, this information would not negate the fact that Fairview would have fired Childs anyway for her illegal actions, and with the new evidence of Olson's misconduct may have additionally fired Olson as well. In addition, when Childs first made the claim to Knight that Olson gave her permission to alter the timecards, Knight took her claim seriously and allowed her to look for documentary evidence that Childs said she had before proceeding with discipline. Childs could not find any evidence that Olson gave her permission to alter the timecards. Regardless of whether Olson gave Childs

9

permission to alter the timecards, Childs's alterations were illegal and therefore qualify as a nonpretextual reason for termination.

Lastly, Childs alleges that Fairview treated other similarly situated employees better. A true comparator would be a manager for Fairview who had continued to alter timecards after being told the practice was forbidden and who was ultimately terminated by either Olson, Engelhart, or Knight. Childs compares herself to Ann Becher-Ingwalson. But Becher-Ingwalson had not altered anyone's timecards, and the employee who said he needed to be paid for missing hours was ultimately found to have not worked those hours. Childs also compares herself to J.S., who continued to alter timecards after warnings not to and was subsequently terminated. While the decision-makers in J.S.'s termination did not decide Childs's termination, Childs argues that Don Moschkau from human resources took part in both terminations. But even if Childs was a comparator with J.S., she was treated very similarly to J.S. in that both received almost the same e-mail asking them to stop altering timecards and both were terminated after continuing alterations.

"[M]ere speculation, without some concrete evidence, is not enough to avoid summary judgment." *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008). Because Fairview's proffered explanation for terminating Childs is not "unworthy of credence," and because Childs did not point to facts showing that Fairview treated similarly situated employees who did not engage in the protected activity more leniently or that Fairview deviated from its policies, there is no genuine issue of fact regarding pretext.

**Affirmed.**